IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

SHANEY TIUMALU,                        )
Las Vegas, NV,                         )
                        Plaintiff      )       Case No.        2:20-cv-2193
v.                                     )
                                       )       **FIRST AMENDED COMPLAINT**
GARDEN CITY COMMUNITY                  )       **UNDER TITLE IX,**
COLLEGE,                               )       **42 U.S.C. §§ 1983 and 1985**
801 Campus Drive                       )       **DEMAND FOR JURY TRIAL**
Garden City, Kansas 67846              )
                                       )
and                                    )
                                       )
HERBERT J. SWENDER,                    )
Individually and as former president   )
of Garden City Community College,      )
in his former official capacity        )
                                       )
and                                    )
                                       )
MERILYN DOUGLASS,                      )
BLAKE WASINGER,                        )
JEFF CRIST,                            )
STEVE MARTINEZ, and                    )
TERI WORF, Trustees of Garden City     )
Community College, in their            )
official and individual capacities.    )
                        Defendants.     )

# FIRST AMENDED COMPLAINT

Plaintiff Shaney Tiumalu ("Tiumalu"), by her counsel and for her causes of action against

Defendants, states and alleges:

## Preliminary Statement

1.      This is a federal civil rights, retaliation under Title IX, and Kansas Consumer

Protection Act action seeking declaratory relief and damages against leaders and officials of

Garden City Community College including in their individual and official capacities and the

College as an institution for interfering with and depriving Plaintiff Tiumalu of established constitutional rights and violation of her statutory rights under federal and state law.

2.     Plaintiff seeks full redress as provided by law against Defendants, state actors, under 28 U.S.C. §§ 2201 and 2202 for declaratory and other relief.

3.     Plaintiff seeks full redress against the Defendant College under Title IX for damages and other relief for retaliation and discrimination against her.

4.     Plaintiff seeks full redress against Defendants under 42 U.S.C. §§ 1983 and 1985 for civil rights violations and civil rights conspiracy violations for damages and other relief depriving Plaintiff of her rights, privileges and immunities secured by the First and Fourteenth Amendments to the United States Constitution, and retaliation against her under civil rights laws and Title IX because she engaged in protected activities (Equal Protection) or was perceived by Defendants to be engaging in protected activities related to her gender.

5.     Plaintiff seeks relief under the Kansas Consumer Protection Act, K.S.A. § 50-623 et. seq., for unconscionable and/or deceptive acts or practices of Defendant College through its agents regarding her scholarships and attendance at GCCC as a student and as a women's volleyball player, among other claims.

6.      Plaintiff seeks relief against Defendants and places on notice any others acting in concert with them, for civil rights conspiracy violations under 42 U.S.C. §§ 1985(2) and (3).

## Jurisdiction and Venue

7.     This Court has jurisdiction over this action by virtue of its authority to hear federal questions pursuant to 28 U.S.C. §§ 1331 and 1343 as to Plaintiff's claims under 42 U.S.C. §§ 1983 and 1985 and pursuant to the First and Fourteenth Amendments to the United States Constitution and under Title IX; and other claims under the Kansas Consumer Protection

Act that are so related as to form part of the same case or controversy pursuant to 28 U. S. C. § 1367(a).

8.      The Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C.§§ 2201 and 2202.

9.      The Court has authority to award attorneys' fees and costs under 42 U.S.C. § 1988.

10.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because all of the events giving rise to claims occurred in the District of Kansas.

## Parties

11.      Plaintiff Shaney Tiumalu is a woman and a citizen of the United States and at the time of the incidents giving rise to the claims asserted she was living and/or going to school, either in person or later online, at GCCC.  She came to Garden City in the Fall of 2016 on a full ride women's volleyball scholarship, having been recruited by her coach, Jacquelynne Matula.  Plaintiff was at all times relevant hereto a degree seeking student of GCCC.  Tiumalu is Hawaiian.

12.      Defendant Garden City Community College ("GCCC" or "College") is a public community College located in Garden City, Finney County, Kansas, established and existing under the laws of Kansas.  It is overseen by a publicly elected board of six trustees who are statutorily charged with the responsibility to operate the College.  To the extent it is relevant to a particular claim, Plaintiff asserts that the institutional Defendant and official capacity Defendants are subject to liability under all civil rights claims by virtue of the *Monell* Doctrine and under Title IX for retaliation and discrimination under that statute.

13.     Defendant GCCC is a "person" within the meaning of 42 U.S.C. § 1983 and pursuant to state law and federal precedent, Kansas Community colleges are not entitled to sovereign immunity under any claims alleged.

14.     Defendant GCCC receives federal funds for its educational programs and thus falls within the purview of Title IX's governance and is subject to liability under the recognized enforcement features of Title IX permitting a private right of action for damages, among other relief.

15.     Defendant Herbert Swender is sued in both his individual and official capacities as a state actor.  At relevant times herein he was the president of Garden City Community College and an employee of GCCC.  Since early August 2018, he was no longer president of the College and upon information and belief by January 2019, he was no longer "officially" employed by the College.  His current residence is believed to be in Oklahoma.  At all relevant times, Defendant Swender was acting under color of state law.  On information and belief, at all times relevant herein as president of the College, Defendant Swender, whether by statutory or delegated means, exercised, seized and/or held decision-making authority over all GCCC policies as well as responsibility for ensuring GCCC complied with all legal requirements.

16.     Defendants Dr. Blake Wasinger, Merilyn Douglass, Jeff Crist, Steve Martinez and Teri Worf are each believed to be residents of Finney County, Kansas and at all relevant time periods each one was a trustee of Garden City Community College.  At all relevant times, each trustee Defendant was acting under color of state law as an elected official of the College.  On information and belief, pursuant to state law trustees are empowered to set policy of the College as well as to delegate certain authorities to College administrators, including Defendant Swender. Each trustee Defendant is sued in both his/her individual and official capacities.

17.     The College is a member of the Kansas Jayhawk Community College Conference, the KJCCC, an affiliate of the National Junior College Athletic Association, the NJCAA, and these two organizations' By-Laws regulate and govern intercollegiate sports participation, including women's volleyball, at GCCC.  The KJCCC rules and regulations at all times relevant hereto dictated that schools could not offer "full ride" scholarships, including room and board, to athletes in any sports.  The NJCAA rules upon information and belief did not contain such limitation.  Defendant Swender was the designated College leader at all times relevant hereto authorized and entitled to act for or on behalf of GCCC in any matters related to KJCCC and NJCAA governance or enforcement.  He was the ultimate decision maker for GCCC with regard to any matters associated with these two organizations.

## FACTS
### Plaintiff's Standing

18.     Plaintiff attended GCCC from the Fall of 2016 through the Spring of 2019 and at all times relevant hereto possesses the rights under Title IX to have access to educational programs and facilities without experiencing sex discrimination, harassment or retaliation by the College for being a female athlete who asserted her own rights to full Title IX protections and proper Title IX enforcement at GCCC.

19.     Defendants have associated Plaintiff with or perceived her to be associated with a protected class of individuals who had on April 10, 2018, publicly raised Title IX issues at the Board of Trustees' meeting, had privately or publicly raised Title IX issues prior to or subsequent thereto, and had spoken elsewhere in the community, including to the local news media and to the athletic conference governing GCCC, about gender discrimination, retaliation and other civil rights or Title IX issues.

20.     Plaintiff possesses the rights under Title IX to be free of retaliation by the College directed against her solely or primarily because Defendants perceive her to be identified with, in a category with, or classified as being part of those individuals who at all relevant time periods herein were critical of the College's handling of Title IX claims as deliberately indifferent to the civil rights of women students and others.

21.     This discriminatory classification system Defendants adhered to carried negative, sex-based discriminatory inferences.  If you were an individual perceived by the College leadership, including but not limited to Defendants, to belong to the "wrong" classification, you were subjected to adverse treatment.  Plaintiff belongs to this protected class and Defendants so perceived her associational status and treated her differently based thereon.

22.     Plaintiff was a host student to Toni Douglass, a community member and an outspoken supporter of women's rights at GCCC, who objected to sexual harassment, having spoken to the Board of Trustees on more than one occasion beginning on April 10, 2018, and continuing thereafter.

23.     Hereinafter, the use of the terms "class," "classification," "identified class," "category," or the like, for Equal Protection purposes, refers to the practice of discriminating or retaliating against female students and athletes as well as individuals who supported civil rights of female students and athletes, or were perceived as doing so, by the Defendants or adhered to by their allies or associates.

24.      Plaintiff possesses the right to not be retaliated against by the College, its agents, employees, volunteers, and its leadership for having become identified as a supporter or perceived supporter of a woman's right to be free of sex discrimination and harassment. Violation of this right to non-retaliation is itself a form and act of discrimination under Title IX.

25.     Plaintiff possessed the right under civil rights laws to Free Speech, Association and Petition under the First and Fourteenth Amendments and to not be retaliated against because of her speech and association with this women's rights classification.

26.     Plaintiff is entitled to Equal Protection of the law uncorrupted by personal animus of Defendants.

27.     Plaintiff possessed rights under the First and Fourteenth Amendments for all actions alleged herein that she contends were triggered by or taken against her by Defendants, which are associated with the perception held by Defendants that she was a member of the class.

28.     The existence and persistence of this classification system among Defendants is evidenced by a Faculty Senate Report to the Board of Trustees issued on May 8, 2018, (incorporated herein by reference).

29.     The Faculty Senate Report is replete with numerous instances of materially relevant gender discriminatory behaviors of Defendant Swender that were ratified or acquiesced in by other Defendants and that resulted in adverse discriminatory harm to students and employees, including Plaintiff.

30.     The Defendants' animus and deliberately indifferent behaviors, including the classification of Plaintiff causally linked to Title IX and Equal Protection violations did not diminish among all other Defendants despite Defendant Swender's termination of employment on or about August 13, 2018.

31.     Individual Trustee Defendants expressed their own Title IX retaliatory behaviors thereafter, which carried on into 2019 for some Trustee Defendants and into 2020 for Trustee Defendants Wasinger and Douglass.

32.     Plaintiff possesses enforcement rights under 42 U.S.C. §§ 1983 and 1985 based on a wrongful conspiratorial agreement reached by more than one person, specifically a meeting of the minds reached among the Defendants, motivated by their hateful animus or discriminatory attitude toward Plaintiff, a member of the class who supported enforcement of Title IX rights, intending to deprive her of her constitutional rights, above, when the conspiracy caused her deprivation and injury.

**Scholarship Irregularities and Plaintiff Forced to Live with Athletic Director**

33.     Defendant College and Defendant Swender engaged in deceptive and unconscionable recruitment and scholarship practices based on customs, policies or practices adopted by its ultimate decision-maker, Swender, and ratified by Defendant Trustees, when Plaintiff was induced to attend GCCC with promises of a "full ride" scholarship, including room and board.

34.     Plaintiff advised her recruiter, coach Matula, that she had "full ride" opportunities at other schools and she could not afford and would not accept an offer from GCCC if it was not a "full ride."

35.     Defendant College and Defendant Swender knew at the time Plaintiff was recruited in 2016 the athletic conference rules of KJCCC prohibited any member College from providing room and board to student athletes, but they ignored those rules and authorized, condoned, or ratified the misrepresentations made to Plaintiff by its athletic department agents.

36.     Defendant College and Defendant Swender actually misled Plaintiff when for the school year 2016-17 they neither billed nor sought payment from Plaintiff for room and board.[1]

---

[1] Plaintiff suffered a season-ending knee injury in the first home game of her first year at GCCC.  She returned to the court for the 2017-18 season.

37.     Defendant College and Defendant Swender maintained the "full ride" façade they contrived, until it no longer served their purposes in 2017 when Plaintiff's volleyball eligibility ended, never dispossessing Plaintiff of the certainty they instilled in her that she was attending GCCC as a "full ride" scholar athlete.

38.     Plaintiff knew of male athletes who were also deemed "full ride" scholar athletes, so these facts swept away any possible reason for concern by Plaintiff about any incongruity between KJCCC rules, NJCAA rules, and GCCC's actions.

39.     In the Summer of 2017 something administratively changed, but Plaintiff was never told she would not have a "full ride" scholarship for 2017-18.  Instead, Plaintiff was drawn into a scheme devised by College administrators, including AD Green, Matula, and Defendant Swender.

40.     Upon information and belief, the athletic department and the business office/student housing departments clashed over accounting for Plaintiff's room and board costs.

41.     Defendant College apparently did not intend to honor its "full ride" promises to her in the fall of 2017, but they failed to fulfill their separate obligation to inform her of that fact at a time when she could have acted to protect her interests.  Defendant College's messages to Plaintiff went back and forth to such a degree that she believes the College intentionally left her in a quandary so she could not protect herself from their misrepresentations and malfeasance.

42.     In June 2017 Plaintiff was summoned back to Garden City from her home in Hawaii by Matula, who had only days earlier told her she could spend her summer at home.

43.     Plaintiff was then housed in a dorm room for a few days before she was summarily ordered to pack her things and move to the residence of the male Athletic Director, John Green.

44.     Plaintiff asked questions but she was told very little except that her coach's plan for her to be a dorm Resident Assistant would not materialize for the summer.

45.     In the midst of moving Plaintiff was explicitly instructed by Matula not to discuss her living arrangements with anyone, including her parents, and if she did speak about her summer residence to say she was living with a woman who was the president of the organization that funded athletic scholarships, but under no circumstances was she ever to tell her host mom, Toni Douglass, that she was living with AD Green or else Plaintiff would suffer serious consequences.

46.     Plaintiff believed the consequences implied by Matula included forfeiting her athletic scholarship and being ostracized by her peers and the College leadership, among other negative effects.

47.     Plaintiff feels she was being intimidated and purposely misled by the people she was supposed to trust and whose orders she was expected to follow, implicitly.  Matula, Green and others at the College sent mixed messages regarding Plaintiff's scholarship status, assuring her everything was going to be okay, not to worry, they were going to help her, they knew she could not afford school but things would work out, to trust them, and the like, which led her to believe whatever was happening among the administrators, her status as a "full ride" scholar athlete would be honored, because she was living with the athletic director and his friend was Defendant Swender.

48.     Matula acknowledged to Plaintiff that Green and Swender both knew about this living arrangement, had okayed it and/or they demanded the secrecy pact, especially with regard to Toni Douglass. Plaintiff was forced to live a lie, which was conceived and carried out by

College leadership, including but not limited to AD Green, coach Matula, and actually or tacitly, Defendant Swender.

49.     Plaintiff was sequestered from adults who might provide guidance so she would not decide to go elsewhere to play volleyball in the fall and this ruse was conceived as a way to accomplish retaining Plaintiff as a volleyball player and keeping her room and board expenses off the College's books.

50.     Plaintiff came to understand that the College administration forbade her from speaking to Toni Douglass because Douglass was a perceived threat to Defendant Swender and AD Green.  No doubt Swender and Green did not want Douglass to know what was going on because Douglass was known to stand up for women's rights and they feared she would blow the whistle on their scheme to mislead Plaintiff about her scholarship or provide guidance on better alternatives for Plaintiff.

51.     During her stay at Green's home on at least one occasion Defendant Swender walked in unannounced while Green was away for several days.  He acknowledged that he expected Plaintiff to be there and commented how the place looked okay while Green was gone.

52.     At the end of July 2017, Plaintiff was moved into the dorms per the instructions of her coach and she remained in campus housing until May 2018.  She was enrolled in fall classes without incident or demand for payment of any purported "outstanding balance".

53.     According to College business office policies and directives, no student would be allowed to enroll for any new semester if a student carried an outstanding balance of any kind to the school.  Plaintiff was not subject to any enrollment prohibition until January 2018, which incidentally coincides with the first semester following the last semester of KJCCC intercollegiate volleyball seasons that Plaintiff would have been eligible to play for GCCC.

54. It was not until sometime in the fall of 2017 that Plaintiff was presented with GCCC bills, which she promptly denied that she owed anything to the athletic department and other campus officials.

55. Plaintiff demanded the "full-ride" education and room and board she was promised, calling the bluff of the administrators involved, including but not limited to Green, Swender, Matula, and as yet unknown others.

56. In response to her adamant denials of owing any sums to GCCC that fall, her coach told her the administration devised a plan to "help her pay her bill" that she denied owing.

57. The plan was that Coach Matula would send Plaintiff a message to come see her, Matula would give Plaintiff cash, tell Plaintiff to take the cash to the business office, apply the cash to her "bill," and then Matula demanded Plaintiff immediately return to Matula and give Matula the cash receipts. Plaintiff did as she was told on numerous occasions and Matula held the cash receipts.

58. She was not to tell her parents about this payment scheme, and so it was not until 2018 that Kathy Tiumalu, her mother, became aware of what was going on in Garden City involving her daughter's scholarship issues and the cash payments the athletic department was funding.

59. Plaintiff was uncomfortable with the plan and so she kept at least one receipt as proof of the scheme as she came to understand the type of College leaders she was dealing with.

60. Plaintiff was led to believe by Matula that AD Green and Matula were funding the cash payments, but she was also led to believe that Defendant Swender may have provided some funds and at the very least Swender was in the loop and condoned the behaviors of Matula and Green.

**Plaintiff's "Bill" to be Waived Per Top Leadership's Instructions**

61.      The volleyball season ends before the spring 2018 semester begins, so it is plausible to conclude Plaintiff's "usefulness" to GCCC athletics diminished precipitously by January 2018.

62.      Plaintiff came back from winter break to find she was not enrolled for the January 2018 semester even though coach Matula had assured Plaintiff before break that she would personally take care of Plaintiff's enrollment.

63.      Plaintiff was not allowed to take classes but required to attend volleyball practices.  She planned to graduate in May 2018 but unless she got enrolled quickly, it would be too late to start classes and she would not graduate.

64.      On or about January 16, 2018, Plaintiff arranged a meeting with AD John Green, Coach Matula, Assistant AD Kevin Schlagel, and administrative assistant, Ashley Rutti.  She wanted her mother, Kathy, to be on the phone to help her, but AD Green refused to allow her mother to be present by phone. AD Green grabbed her phone, saying no parents were allowed, and placed it in a separate office.

65.      Plaintiff's purpose for the meeting was to get enrolled and for the College to take care of its "bill" they promised her that she would never have because she was on a "full ride" scholarship.

66.      As of January, the "bill" balance forward was a purported $8,506 in past fees, including room and board.

67.      Plaintiff demanded she be enrolled and the "bill" zeroed out.  She stood her ground and was eventually enrolled.

68. She no longer remained silent. On or about January 23, 2018, after her host mom, Toni Douglass, came to learn about what had been happening to Plaintiff, Douglass and Plaintiff had a meeting with AD Green. Both Plaintiff and Douglass were assured by the AD that Tiumalu's "bill" would be Zero by the time the semester ended in May.

69. On information and belief, not long thereafter Defendant Swender summoned the residence hall director, AD Green, coach Matula, and perhaps others, to a meeting to hash out how Plaintiff's bill was going to be handled and zeroed out.

70. Plaintiff became aware that by January 24, 2018, her "bill" to the College was supposedly taken care of and the business office had been informed.

71. On information and belief, on January 24, 2018, Dee Wigner, the College CFO and Swender's second in command, issued a memo to the College business officers telling them she had "been instructed" to allow Plaintiff to enroll in Spring 2018 classes, and not to place a hold on Plaintiff's account or on her transcript. In addition, Plaintiff was "not to be turned over to collections for any outstanding account balance."

72. These directives were issued at the direction of the only College official with the authority to make such final decisions stand and discharge Plaintiff's purported "debt" to GCCC—Defendant Swender.

73. The College was in an upheaval on many gender-based fronts from on or about January 2018, perhaps earlier, and Plaintiff Tiumalu was swept up in the whirlwind of criticisms being waged against GCCC's leadership, some of which she was aware and much of which she was insulated from.

74. However, by April 2018 Plaintiff received push back from the business office and matters began to spiral out of Plaintiff's control.

## The Unannounced Title IX Investigation Incident

75.      On Friday, April 13, 2018, just three days after public comments critical of the

College's handling of Title IX complaints involving the cheer program were made to the Board

of Trustees by Toni Douglass and other community members, the College administration staged

a surprise Friday night Title IX investigation against Plaintiff Tiumalu based on Defendant

Swender's and his administration's perceptions that she: a) had made Title IX claims alleging

sexual harassment against the athletic director and needed to be punished or deterred from taking

further action; b) was closely associated with Toni Douglass and others who had recently

become outspoken supporters of Title IX and critics of the College's lackluster response to very

recent Title IX claims related to the cheer program and needed to be punished or deterred from

such association; and c) had "petitioned" the College's athletic conference for dispensation,

which the College perceived 1) to be bound up in gender discrimination and/or 2) to be an

association-related petition and made at the urgings of women's right supporters critical of the

College's Title IX stance.

76.      On or about Wednesday, April 11, 2018, a copy of a letter dated January 25,

2018, from Plaintiff "To whom it may concern" was received by the College's HR department.

It outlined issues associated with Plaintiff's living arrangements the summer before with AD

Green and triggered KJCCC and NJCAA issues associated with Plaintiff's "full ride"

scholarships having been falsely represented to her.  Complaints associated with women's rights

at GCCC were definitely mounting and reaching a critical mass.

77.      At the Tuesday, April 10, 2018, Board of Trustees' monthly meeting, the

Defendants had begrudgingly listened to public comments from three community members and

voted to deny the proposed comments of a student cheer member on the topic of inadequate

handling by GCCC of sexual harassment/Title IX claims associated with the cheer program. Video of the Board of Trustees' meeting is incorporated herein by reference.

78.     Between Tuesday April 10 and Friday April 13, 2018, news media accounts of the public criticism and Board Member intolerance for the student's plea to address the Board were rippling through the Garden City community, causing Defendants displeasure with the negative publicity.

79.     In response to Plaintiff's letter, which was perceived to contain a potential claim of Title IX sexual harassment, a Title IX investigator from Dodge City Community College named Bev Temaat was retained by the College on or about April 13, 2018.

80.     Temaat came to the GCCC campus, went to Plaintiff's dorm room at 6:30 p.m., unannounced and after normal business hours, and without informed consent of Plaintiff to review her education records under FERPA, Temaat proceeded to bully and attempt to coerce Plaintiff and her mother with a pseudo-Title IX investigation.

81.     Temaat had no appointment arranged by GCCC officials with Plaintiff and as a Dodge City Community College employee, absent both actual authority of the GCCC administration and Plaintiff's informed consent, she had no authority on GCCC's campus to be privy to Plaintiff's private education-related information.

82.     Using Plaintiff's new volleyball coach as the go-between, Temaat and the College's HR Director, Emily Clouse, confronted Plaintiff and her mother by phone conference trying to extract information in an attempt to catch both Plaintiff and her mother off guard and nip in the bud allegations they perceived Plaintiff to have made regarding Title IX issues.

83.     This incident was retaliation against Plaintiff under Title IX and Defendants knew or should have known Temaat's visit was not a proper Title IX investigation.

84.     This was the second time in less than two months College administrators had subjected a female athlete to a surprise Title IX inquiry and evidences the Defendant College's custom, pattern and/or practice of deliberate indifference to the Due Process rights of Title IX victims.[2]

85.     Temaat misused whatever state authority she claimed or possessed, if any, to accost Plaintiff in a peculiarly similar manner to the February Everett situation and denied Plaintiff her Due Process rights—it was a Friday evening after 6:30 p.m., no warning, no explanation, demanding cooperation, lacking authority to perform a Title IX investigation absent consent of the complainant, inadequate due process, in an improper setting at Plaintiff's dorm room, and employing coercive tactics.[3]

86.     Defendant Trustees have never disavowed the Temaat improper investigation, and they have condoned or ratified it as part of their vote to accept findings of an "independent investigation", detailed below.

### KJCCC Sanctions and Retaliation

87.     Upon information and belief, on or about April 13, 2018, the KJCCC and the NJCCC were apprised of Plaintiff Tiumalu's predicament involving her past summer's living arrangement and the scholarship misrepresentations she had been subjected to, by someone emailing a report to these organizations anonymously.  Plaintiff did not send these emails.

---

[2] On February 23, 2018, GCCC's athletic director, John Green, called a Friday evening meeting on short notice involving cheer student, Elizabeth Everett, who had raised complaints of sexual harassment involving the cheer coach and blackmail by a male cheer peer, and the AD surprised Everett as he proceeded to conduct a pseudo-hearing with four males, himself, the Assistant Athletic Director, the cheer coach and the male perpetrator, all aligned against Everett.  She was under siege, by herself in the AD's office, without warning, notice and an opportunity to know what the purpose of the meeting was or to bring witnesses or supporters with her.

[3] Ironically, Temaat is believed to have been retained by GCCC to meet with Elizabeth and Eleanor Everett in a prearranged, authorized Title IX investigation.

88.     Upon information and belief, the KJCCC received a copy of a January 25, 2018, letter attributed to Tiumalu.  They began an investigation of the information reported.  They requested the College provide a response in early May.  They received the College response dated May 9, 2018 and issued sanctions against the College thereafter.

89.     In the meantime, on May 3, 2018, someone from the College contacted the Garden City Police Department and reported a purported blackmail/extortion attempt by Plaintiff Tiumalu, against the College.

90.     A copy of the police report was provided through a Kansas Open Records Act request and is incorporated by reference herein.  According to the report, the date of the report/investigation is listed as May 15, 2018, not May 3, 2018.  It was filed by a Detective Freddie Strawder.  The report fails to identify who from the College contacted him, which is not typical of GCPD reports.

91.     Plaintiff Tiumalu was contacted by Detective Strawder along with another officer on May 3, 2018; the date in the police report is simply wrong, which is a disconcerting fact.

92.     Upon information and belief, Detective Strawder at the time of this incident was an employee of both the GCPD and an adjunct instructor in the criminal justice program at GCCC.

93.     Plaintiff did not engage in any meaningful discussions with the officers.  She felt threatened by two officers coming to her dorm room, believing at the time that they were summoned there most likely by a contact from Defendant Swender to scare her after the Temaat event of April 13, 2018, as well as from earlier scholarship and enrollment issues in January 2018.

94.     Strawder engaged in discussions on campus with two College instructors who were known by the College administration to be supportive of Plaintiff.

95.     In those discussions, which are recorded and incorporated herein by reference, Strawder, on May 3, alluded to the fact that the president was watching individuals he suspected were his enemies among employees and these employees should watch how involved they were with students who had issues (referring to Tiumalu, presumably) because it could get them drawn into trouble themselves.

96.     It is plausible under the circumstances that Defendant Swender was involved in contacting Strawder, directly or indirectly, to pressure Tiumalu using unjustified allegations of criminal misconduct to avoid a civil dispute with her.

97.     Plaintiff learned on or around May 3, 2018, that an investigation by the KJCCC was underway, that Tiumalu had angered the president, the College was likely facing sanctions in the volleyball program, and the linkage between the Strawder "investigation" for purported extortion/blackmail was wound into and about the January 25, 2018 letter, and that issues regarding her "bill" triggered this extortion/blackmail investigation by the GCPD.

98.     Plaintiff was aware that just a week or so earlier, on April 25, 2018, Toni Douglass had been issued a No Trespass Notice banning her from the campus, arising out of her having exercised her free speech rights and based on Equal Protection, class-based issues.

99.     Upon information and belief, Defendant Swender was responsible for causing the issuance of the Douglass ban and was likely the person who contacted GCPD initiating Strawder's investigation.  The GCPD dropped the Tiumalu matter as the GCPD report states.

100.    The interwoven nature of all these events was not lost on Plaintiff, for example, involving a Title IX investigator from Dodge City badgering her, her host mom, Toni Douglass's

being subjected to a campus wide ban via a No Trespass Notice, GCPD coming to her room investigating supposed allegations of extortion or blackmail against her, and the separate incident involving president Swender and HR's Emily Clouse mentioned below, which took place a few weeks priors to the GCPD visit.

101.    In mid to late April 2018, Plaintiff and one of her instructors were in the administration building asking questions about her "bill", seeking to confirm it had been zeroed out, and requesting the release of her transcript.  Plaintiff and the instructor observed Swender and Clouse appeared and were watching them, pointedly circling them, from opposite directions and staring down Plaintiff and the instructor.  The intensity of the two administrators' scrutiny was palpably obvious.

102.    The instructor and Plaintiff commented to one another how eerie and threatening that incident was, which occurred right around the time in mid-April that Plaintiff's bill was becoming a larger issue again, business officials were holding up her transcript, more people had come to know about Tiumalu's problems with her "full ride" scholarship, and Plaintiff had just been informed her credit hours toward graduation were shy about 6 hours of required courses, which she did not foresee.

**The Trustees' Flawed Report and Other Retaliatory Behaviors**

103.    Plaintiff left Garden City in 2018, not having graduated due to being short credit hours; however, retaliation by certain Defendant Trustees continues into 2020.

104.    Plaintiff's situation was mentioned in the Faculty Senate Report of May 8, 2018 and the Trustees retained the services of an independent investigator to look into all matters raised therein.

105.    During the Faculty Senate investigation the College Trustees started in June 2018, instead of the president being put on paid administrative leave while an investigation was done, five of the six Trustees voted to keep Swender at the helm, while he and his closest staff were seen working unusual hours, late at night, at the office.  Then, in the mornings there would be bags of paper shreds, so much paper having been processed during the repeated late-night shifts that the motor blew out on the heavy-duty shredder nearby the president's office.

106.    Besides rumors of questionable document destruction in the president's office, other inappropriate and disturbing investigatory tactics came to light involving Swender.  For example, on May 10, 2018, a "Fake" KORA request, under the Kansas Open Records Act, was received and then processed through IT on a fast-track basis, pushed by the then head of HR, Emily Clouse, asking for the email records of more than 20 people, including Plaintiff, who had Title IX issues at the College.  This was only 2 days after the Faculty Senate Report was presented to the Trustees seeking Swender's removal or the Trustees' resignations and seven days after the Strawder GCPD "investigation".

107.    The KORA request was a fishing expedition concerning individuals who might be termed "critics" of the president, covering the time frame January 1, 2017 forward.  Evidence is expected to link the recipient of the encrypted thumb drive that contained Plaintiff's and others' KORA-requested emails to none other than president Swender, who read through them, according to the digital bread crumb trail.  This incident evidences the retaliatory intent and animus of Swender to investigate Plaintiff's and others' communications, perhaps to ferret out enemies of his administration.

108.    It came to light in late July 2018 that the IT Department had never been advised of two different "litigation hold letters" directed to College leadership, which should have been

referred to IT.  Plaintiff Tiumalu was specifically mentioned in a June 8, 2018 hold letter and six weeks or so had passed and yet the IT department had not been informed by Swender or his agents.  The computer system litigation holds procedures had not been followed or implemented, resulting in routine destruction of hard drives and machines, which would have been retained had the IT department been advised.  Upon information and belief, relevant digital records were purposely destroyed or overwritten because the litigation hold procedures were not implemented despite Swender's acknowledged, actual receipt of the notices to retain information.

109.   The Defendant Trustees publicly sought to quell criticism of their alleged oversight failures by shifting the community narrative to focus on their directives to the investigator to perform his work with evenhandedness, transparency, and fairness to all concerned.  He was charged with producing a fair, accurate, and unbiased report of all issues raised in the May 8, 2018 Faculty Senate Report.  Plaintiff Tiumalu's situation was one of many issues addressed in the Faculty Report.

110.   Faculty, staff, employees and concerned citizen patrons of the College voiced concerns about retaliation, given the fact that president Swender remained in responsible charge of the College, rather than being placed on administrative leave, during the purportedly "unbiased" investigation.

111.   The Defendant Trustees publicly promised the investigator's "independent" report would evidence their trustworthiness and sincerity of purpose as guardians of the College and they vowed the investigator was not beholden to any preconceived agenda except to get to the bottom of the allegations of the Faculty Senate Report no matter where the facts led.

112.   In response to concerns about retaliation and to prompt unfettered cooperation by anyone with knowledge of facts underlying the May 8, 2018 Faculty Senate Report, the Board of

Trustees provided oral and written assurances of non-retaliation to individuals, which by implication included Plaintiff, if they would cooperate and interview with the investigator. Whether or not an individual participated in the investigation, the assurances of non-retaliation were understood to include Plaintiff.

113.    The investigator's purportedly fair/unbiased report was eventually presented months later to the Board and immediately debunked when the Trustee Chair, Defendant Steve Martinez, was shamed into a public apology to Toni Douglass after admitting he had lied about his statements contained in the report.  Video of this meeting is incorporated by reference.

114.    The unquestioning adoption of the "independent" investigator's report by the Defendant Trustees in January 2019, knowing that the report contained fatally flawed, material misrepresentations from the Defendant's own Board member that it was presented by a subordinate who inaccurately filtered all the information to the Board, and that the tone and tenor of the report quite obviously was written with a biased viewpoint in favor of Swender, is evidence of ratification and deliberate indifference of the Defendant Trustees.

115.    The report was a sham and should have been immediately questioned by inquiring Board of Trustee members asking themselves whether it was truly "independent."  It obviously was tainted by Defendant Trustee Martinez's admission to lying to the investigator and the vote by the Board should have rejected, not adopted, the report's contents.

116.    The Defendant Trustees rushed to judgment in favor of Swender, when they should have recognized their fiduciary duties are to the College, not the one person they supervised.

117.    The five Defendant Trustees who VOTED to accept the tainted report of the investigator, by their votes made an official, on the record, decision (in January 2019 at a special

meeting) NOT to remedy the issues raised by Title IX supporters, which included Plaintiff's matters.  This decision and this vote are the epitomes of gross negligence at a minimum and intentional misconduct at its maximum.  The adoption of this formal report is more than just "deliberate indifference."

118.     The adoption of this debunked report is also evidence of motive to retaliate and evidence of animus against Plaintiff because Board members should have questioned any references to Plaintiff when the investigator begins his narrative on page 20 stating he did not interview Plaintiff.  Trustees should know the restrictions FERPA places on Colleges not to share personally identifiable information with anyone, much less an investigator for the Board who was denied an interview with Plaintiff.

119.     Plaintiff's education records were obviously reviewed and released by the investigator and logically it would have been a legal impossibility for him to have in his possession and for his purposes the requisite consent necessary from Plaintiff to release the College and its Trustees from their obligations to hold her information private associated with the Trustees' investigation.

120.     Plaintiff was not interviewed and did not cooperate with the investigator.  However, the investigator intentionally went into great detail about incidents involving Plaintiff without effectively redacting Plaintiff's identifying, private records and information.  The noted omissions of Plaintiff's consent and participation should have raised red flag warnings for Trustees, but they blindly voted to adopt the fatally flawed report.

121.     This same Board vote also separately exemplifies another instance of ongoing Title IX based retaliatory action against Plaintiff in January 2019 by the publication and release of the investigative report's findings the Board knew or should have known were:

A.  misstatements of facts, as reported (per se);

B.  misstatements of facts by omission (per quod) of material necessary to make the

Report accurate and not misleading or defamatory;

C.  improper findings/conclusions that became adopted Board actions/policies caused by

intentional release of information they had no right to release without Plaintiff's

consent.

D.  breaches of the Trustees' express or implied assurances/contractual obligations to

individuals, including Plaintiff, not to retaliate in the Trustee-initiated investigation of

the Faculty Senate Report, which included the reasonable counter-inference that a

choice NOT to participate would not be retaliated against or punished, as well.

122.    The report keeps mentioning Plaintiff's issues and references Title IX

dismissively, failing to recognize Title IX applies to more than just explicit sexual harassment,

but reaches deliberate indifference to women's rights and retaliation for supporting women's

rights.  The College recognized there are Title IX issues at stake and unilaterally instituted a Title

IX investigation by retaining Temaat from Dodge City to conduct an investigation associated

with Tiumalu.

123.    The Trustees' acceptance and adoption of the report, in an effort to eradicate

negative publicity in the short term and cover up the potential liability for the Defendants'

intentionally discriminatory and retaliatory conduct in the long term, is deliberate indifference

and constitutes official ratification of constitutional violations and contract-based violations.

124.    The Defendant Trustees' acceptance vote of the flawed report evinces their

retaliatory animus to accept any conclusions, no matter how irreparably flawed, to wrongfully

shut down public criticism.

125.    The official report is incorporated herein by reference.  On its face, the report was a self-contained Title IX retaliation piece adopted by the Trustees and evidences their deliberate indifference to Plaintiff based on her gender and violations of her Equal Protection, Due Process, First Amendment and Fourteenth Amendment rights, including her Free Speech, Association and Petition rights under § 1983.

126.    The Trustee's adoption of the investigator's report, which included sufficiently identifying private information about Plaintiff from Plaintiff's College records, was a violation of FERPA when they released the report to the public. The now public report, which included false or unsubstantiated assertions, maligned Plaintiff.

127.    This wrongful Title IX categorization of Plaintiff, based on her perceived Equal Protection classification, was a perception adopted by the Defendant Trustees through at least January 2019 and in the cases of Defendants Wasinger and Douglass to the present day.

128.    Plaintiff contends this was done intentionally, to harm Plaintiff in her community standing, destroy her athletic career and use the power of state authority to deter any other women from ever seeking solace in GCCC Trustees' neutral and appropriate oversight.  It was Title IX retaliation by the Defendant Trustees.

129.     The College, as an institution, does not have the right to violate Plaintiff's civil rights or quell supporters of Title IX rights using questionable means.  Even though Swender was no longer with the College by August 2018, the five Trustees who ratified these improper behaviors culminating in a January 2019 vote adopting the findings of the investigator's sham report, still hold a grudge against Plaintiff.  The evidence will show these five Trustees have spoken in favor of Swender's behaviors on other occasions, after August 2018, taking issue publicly with the protected class Plaintiff is perceived to belong to.

130.     The Plaintiff and others similarly situated have been and still are being sent the message they are dissuaded from making charges of discrimination because nothing has or will change.

131.     Plaintiff seeks punitive damages to the extent they are awardable as an earsplitting warning to deter other state actors from engaging in similar aberrant behaviors and risk bringing GCCC or any other Kansas educational institution into analogous, unnecessary disrepute by out of control, state-sanctioned folly and irrationality, carried out by unconstrained, powerful and manipulative College leadership.

**A Final Cautionary Tale of Systemic Issues and Ongoing Retaliation**

132.     Defendants Wasinger and Douglass, in June 2020, embarked on a new tactic to further violate Plaintiff's civil rights and to blame and attempt to shame civil rights advocates for having sought to enforce their and others' Title IX and constitutional rights through the federal court system when they publicly blamed civil rights advocates within the last two years as the reason for a reported $500,000 plus jump in insurance premium/deductible costs for the College's errors and omissions liability coverages, and by doing so, they breached their oral and written agreements of non-retaliation associated with their prior investigation.

133.     Trustees Wasinger and Douglass explicitly blamed a discrete, protected class of individuals entitled to due process, first amendment protection and equal protection of their civil rights as the cause of the rate bump, because the protected class had initiated enforcement actions, including Plaintiff.

134.     On June 9, 2020, at the monthly Board meeting of GCCC Trustees and again on June 25, 2020, at the GCCC Trustee budget retreat meeting, Defendant Trustees Wasinger and Douglass openly label, blame and attempt to shame anyone who has engaged in the past two

years in Constitutionally-protected civil rights conduct, including under Title IX and § 1983, and recently filed civil rights claims against the College, as essentially people out to wrongfully harm the College financially.

135.    These two Defendants publicly expressed on publicly posted video, their jointly-held, unlawful purpose of impeding, hindering, obstructing, or defeating the due course of justice in this state, by specifically mentioning as a class to which Plaintiff belongs, i.e. civil rights complainants against the College and then blaming the class for financially harming the College by causing its insurance rates to skyrocket.

136.    Defendants expressed their intent to deny Plaintiff and others similarly-situated the Equal Protection of the law because she and others have lawfully brought civil rights claims.

137.    They attributed to that class the College's recent, high-risk categorization by insurance carriers and a concomitant 5-fold deductible increase and 10-fold premium increase over the prior year's insurance costs, tallying an approximately $500,000.00 hike.

138.    The exorbitant increase in insurance costs was then linked by Defendants Wasinger and Douglass to significant reductions in faculty/staff and harm to student offerings in an attempt to retaliate against Plaintiff and create an 'us' against 'them' civil rights based divisiveness, whose unmistakable purpose was to deter, impede, hinder, obstruct or defeat civil rights and deny Plaintiff the equal protection of the law.

139.    Defendants Wasinger and Douglass reached a meeting of the minds, intending to discourage any civil rights actions against the College by their public comments.

140.    They are engaged in a conspiracy to intimidate potential witnesses in this federal litigation by publicly attacking and labeling anyone who has raised civil rights claims against the College as harming the College.

141.    Defendants Wasinger and Douglass knowingly sought to intimidate and threaten Plaintiff and others from testifying "freely, fully and truthfully" in this suit in federal court by using their state actor authority to call out ongoing litigation recently instituted against GCCC, which by such definition refers to Plaintiff and this suit.

142.    Their comments were also an attempt to deprive Plaintiff of equal protection of the laws and to impede, hinder, obstruct or defeat the due course of justice with intent to deny Plaintiff from attempting to enforce the right of equal protection of the laws.  Blaming Plaintiff for financial woes of the College caused by its leadership's decisions to ignore legitimate civil rights claims under federal law separately compounds the civil rights violations alleged elsewhere and supports Plaintiff's new civil rights claims warranting relief.

143.    It is more likely true than not that insurance rate hikes are tied to the Defendants' administrative oversight blunders than to civil rights claims, when civil rights issues may have been totally avoided had the Defendant Trustees placed Defendant Swender on paid administrative leave during the investigation.  Raising pretextual civil rights retaliatory allegations against Plaintiff and blaming advocates for rate hikes over which she and they have no control is an additional form of retaliation against Plaintiff.

**Defendants Caused Plaintiff's Damages and Constitutional Harms**

144.    The constitutional violations that caused Plaintiff's damages were not isolated acts of misconduct but instead resulted directly from Defendants' official custom, policies, patterns, or practices.

145.    The Defendants adopted and implemented a custom, policy, and practice of permitting Swender and College officials to abuse their positions to violate Title IX rights and processes.

146.     The Defendants adopted and implemented a custom, policy, and practice of permitting unlawful sexual assault, harassment, and discrimination against female athletes.

147.     The Defendants adopted and implemented a custom, policy, and practice of retaliation toward individuals, like Plaintiff, who is a member of the protected class.

148.     The Defendants adopted and implemented a custom, policy, and practice of authorizing improper, inadequate and unreliable investigations.

149.     The Defendants adopted and implemented a custom, policy, and practice to ignore and fail to accept Title IX complaints.

150.     The Defendants adopted and implemented a custom, policy, and practice of chilling the First Amendment rights of individuals who spoke out against the College's unlawful practices.

151.     The Defendants adopted and implemented a custom, policy, and practice of failing to adequately supervise or discipline its administrative personnel.

152.     Defendants, through the continued encouragement, ratification, and/or approval of the aforementioned policies, customs, and/or practices, in spite of their known and obvious inadequacies and dangers, have been deliberately indifferent to Plaintiff's and other individuals' constitutional rights.

153.     Defendants, through the continued encouragement, ratification, and/or approval of the aforementioned policies, customs, and/or practices, and in spite of their known and obvious inadequacies and dangers, knew such policies were substantially certain to cause constitutional violations to Plaintiff and she was damaged thereby.

## COUNT I: TITLE IX RETALIATION
### Plaintiff v. Defendant Garden City Community College

154.    Plaintiff incorporates by reference the facts and allegations set forth in all preceding paragraphs as if fully set forth here.

155.    The Supreme Court has long recognized a cause of action for Title IX retaliation against individuals identified as supporting women's civil rights on educational institution's campuses.

156.    The College is a recipient of federal funds.

157.    Plaintiff engaged in a number of protected activities under Title IX including but not limited to the following:

A.    When her letter of January 25, 2018 was perceived to be a Title IX complaint by the College authorities, including Defendant Swender, and a Title IX investigator was sent on April 13, 2018 to badger and confront her.

B.    When Plaintiff shared with Toni Douglass what she had been told never to share with her, the fact she lived with John Green in June/July 2017, and Green and Swender were concerned she might raise Title IX issues.

C.    When Plaintiff and Douglass together went to John Green in January 2018 to deal with Plaintiff's "bill" and Plaintiff became perceived as a member of the class Douglass and others were identified with.

D.    When she refused to participate in the Trustees' investigation but was inappropriately dragged into the public report due to her class identification.

E.    When Plaintiff went to the media to reveal the behaviors she had been subjected to and exercised her free speech and association rights, which were critical of the College administration.

F.  When she refused to participate in the May 3, 2018 GCPD questionable investigation.

G.  When Plaintiff at first agreed to participate in the college's investigation of the claims made in the Faculty Senate Report by agreeing to be interviewed and provide information about claims she had relevant and first-hand knowledge about, but after hearing about the manner in which others who spoke were treated, changed her mind. That decision not to cooperate was itself a protected activity but was turned into an opportunity to further retaliate against her and other women when Trustees in January 2019 adopted knowingly inaccurate, misleading and defamatory statements contained therein related to her.

158.  Plaintiff suffered a materially adverse action when she:

A.  was subjected to an act of sabotage of her athletic and professional career with the Trustees' publication of its report containing 6 pages of misleading facts and privacy invading narrative.

B.  was subjected to this retaliatory incident of the Trustees because she refused to speak to their investigator.  This act of retaliation, even through the acts of another, equates with a material adverse action.  The threat to her economic standing was real and the likelihood of continuing whisper campaigns, once started, remains.

C.  has been dissuaded from making charges of civil rights violations and discrimination by the acts of Defendant Swender sending Strawder and another officer to her dorm room on pretextual reasons.  The misuse of law enforcement is especially adverse because she feels she cannot easily trust officers of the law after these behaviors by state actors with unrestrained power.

D.  was subjected to a Fake KORA request on May 10, 2018, among more than 20 other individuals subjected to the same fishing-expedition request by an administrator, which in her case was misused to violate federal FERPA law requirements, believed to have been issued by Defendant Swender and had her personal emails investigated and reviewed by the person she believes is at the center of the threats of intimidation, Swender.  This violation is a retaliatory and predatory-like behavior by someone who misused his state authority in the guise of another person, using the name K. Dee King.

E.  Was deprived of her associations with friends, teammates and colleagues due to the actions of the College that culminated in the volleyball program's sanctions by KJCCC.

159.    There is a causal connection between the protected activity and the materially adverse actions, as evinced by the following facts:

A.  The retaliatory acts came immediately after the protected activities.

B.  The retaliatory acts occurred as part of a clear chain of cause and effect stemming from the protected activity.

C.  The retaliatory acts were in some cases designed to thwart the efficacy of Plaintiff's protected activities and deter her from engaging in protected activities thereafter.

D.  The College trustees' flagrant and open disregard for protecting female students and athletes subjected to gender harassment and retaliation.  The trustees' conduct evinces a direct causal link between the College leaderships' intolerance for Title IX enforcement and actual acts of hostility toward women including such significant retaliation as to be extreme and outrageous behavior.

E.  When in January 2019 the five Trustees voted to adopt the flawed report and publicly disclose private, FERPA-covered information.

F.  Defendants Wasinger and Douglass, in at least two Board of Trustees meeting in June 2020, used their positions as state actors to attempt to deter, intimidate, threaten, impede, hinder, obstruct, and defeat Plaintiff's First and Fourteenth Amendment rights to Free Speech, Petition and Association civil rights claims alleged herein, deter witnesses, and blame her for the College's insurance woes, which they linked specifically to civil rights claims, including by inference Plaintiff's actions, as well as to harm her Equal Protection rights.  They engaged in constitutional violations and retaliation intending to harm her, hold her up to ridicule, and blame her for financial harm for which Plaintiff contends such blame, if any, should be placed at the feet of Defendants for their own civil rights enforcement failures at times when their acts would likely have mitigated College exposures.

160.    Defendants' conduct was wanton and in reckless disregard for the rights and safety of Plaintiff.

161.    The Defendant College has not engaged in conduct reasonably calculated to end the harassment or retaliation.

162.    Defendant College exhibited deliberate indifference to Plaintiff's rights and wellbeing as alleged above.

163.    Defendant College exhibited conduct that warrants punitive damages.

164.    As a direct result of Defendants' conduct, Plaintiff suffered emotional distress, anxiety and stress, reputational damage, denial of and violation of constitutional rights under the

Title IX, and the First and Fourteenth Amendments, and additional costs and damages, including attorneys' fees.

WHEREFORE, Plaintiff prays for an award of actual damages against Defendants in an amount in excess of $75,000, under Title IX, fully compensating Plaintiff for the damages suffered as a direct and proximate result of Defendants' unjustified actions, an award of interest and costs of suit, including reasonable attorney fees, punitive damages as justified, and such other and further relief as the Court finds just and proper.

**COUNT II: DEPRIVATION OF RIGHTS UNDER THE**
**UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983**
**FIRST AND FOURTEENTH AMENDMENT VIOLATIONS**
Plaintiff v. GCCC, Herbert Swender, individually and officially,
and each Named Trustee in official and individual capacities

165.    Plaintiff incorporates by reference the facts and allegations set forth in all preceding paragraphs as if fully set forth here.

166.    Plaintiff alleges that at all times relevant hereto, Defendants Garden City Community College, Herbert Swender, Blake Wasinger, Jeff Crist, Merilyn Douglass, Steve Martinez and Teri Worf, were acting under color of state law and their actions were made possible by virtue of state law.

167.    Plaintiff alleges each Defendant in their institutional, individual or official capacities deprived her and caused her to suffer the loss of established federal constitutional rights guaranteed to her by the First and Fourteenth Amendments when each Defendant committed the following acts and violations, including acting in accordance with Defendant GCCC's custom, policy and/or practice in violating Plaintiff's constitutional rights as set forth below:

A.  Their acts retaliating against Plaintiff sought to deter and punish her from exercising her First and Fourteenth Amendment rights for having spoken to the media.

B.  Their acts intended to disturb her associational rights by pressuring her not to associate with Toni Douglass, who Defendants believe is an existential threat to the College because she is an outspoken advocate for women's rights on campus and because they feared Douglass would hold them accountable when it came to the treatment of Plaintiff.  Swender and Green interfered with Plaintiffs friendships in an attempt to discourage her speech, as well.

C.  The Defendant Trustees failed to intercede on behalf of Plaintiff when their fiduciary duties obliged them to do so, thereby condoning their employees' wrongful behaviors because they knew their employee Swender or someone acting on his behalf and at his request had sent Strawder to attempt to get Plaintiff arrested for a debt she did not owe and for a criminal act she did not commit.  The five Trustees voted to accept the flawed report that included this information, thus confirming their inability to properly carry out their duties as fiduciaries to the College.  They set poor examples of leadership, as well.

D.  When the Trustees refused to take action in the Spring of 2018 when they became of aware of Swender's vindictive behaviors such as sending the Title IX investigator to badger and confront Plaintiff, allowing matters to escalate by May 3 into the spurious law enforcement scare tactic, and then culminated in the Trustees improper release of her private records in January 2019, evidencing a pattern and practice of improper oversight and civil rights violations.

E.  When Trustees failed to take prompt, remedial action to protect Plaintiff from unjustified and unconstitutional infringement of Plaintiff's First and Fourteenth Amendment association, petition and free speech rights in violation of 42 U.S.C. § 1983 for having spoken or raised issues to the displeasure of Defendants (an unlawful content-based retaliation).

F.  Defendants Wasinger and Douglass, in at least two Board of Trustees meeting in June 2020, used their positions as state actors to attempt to deter, intimidate, threaten, impede, hinder, obstruct, and defeat Plaintiff's First and Fourteenth Amendment rights to Free Speech, Petition and Association civil rights claims alleged herein, deter witnesses, and blame her for the College's insurance woes, which they linked specifically to civil rights claims, including by inference Plaintiff's actions, as well as to harm her Equal Protection rights.  They engaged in constitutional violations and retaliation intending to harm her, hold her up to ridicule, and blame her for financial harm, which Plaintiff contends such blame, if any, should be placed at the feet of Defendants for their own civil rights enforcement failures at times when their acts would likely have mitigated College exposures.

168.  As to each lettered assertion above, these bad acts by the Defendants were done without lawful justification, intentionally, maliciously, and/or with a deliberate indifference to or a reckless disregard for the natural and probable consequences of their acts.

169.  Defendants knew or should have known that their conduct would cause injury and damage to Plaintiff in violation of Plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its First and Fourteenth Amendments.

170.     As a result of the foregoing, Plaintiff was deprived of her associational, petition, and free speech rights as well as the right to be free from retaliation for exercising her constitutional rights as specified, she suffered specific and serious prior restraint, and was otherwise damaged and injured.

WHEREFORE, Plaintiff prays for an award of actual damages against Defendants in an amount in excess of $75,000, under the Constitution and 42 U.S.C. § 1983, fully compensating Plaintiff for the damages suffered as a direct and proximate result of Defendants' unjustified actions, an award of interest and costs of suit, including reasonable attorney fees pursuant to 42 U.S.C. § 1988, punitive damages as justified, and such other and further relief as the Court finds just and proper.

## COUNT III: 42 U.S.C. § 1983 *MONELL* CLAIM
## UNCONSTITUTIONAL CUSTOMS, POLICIES, AND PRACTICES OF DEFENDANT
### Plaintiff v. GCCC

171.     Plaintiff incorporates by reference the facts and allegations set forth in all preceding paragraphs as if fully set forth here.

172.     Defendant GCCC was at all times relevant to this Complaint responsible for the polices, practices, and customs of the College.

173.     Defendant GCCC, by and through its final policymakers, had in force and effect during the years 2018 to the present, and for years before, a policy, practice, or custom of permitting Swender and College officials to abuse their positions to violate Title IX rights and processes.

174.     Defendant GCCC, by and through its final policymakers, had in force and effect during the years 2018 to the present, and for years before, a policy, practice, or custom of permitting unlawful sexual assault, harassment, and discrimination against female athletes.

175.     Defendant GCCC, by and through its final policymakers, had in force and effect during the years 2018 to the present, and for years before, a policy, practice, or custom of retaliation toward individuals, like Plaintiff, who supported and advocated for the enforcement of Title IX and civil rights on behalf of others.

176.     Defendant GCCC, by and through its final policymakers, had in force and effect during the years 2018 to the present, and for years before, a policy, practice, or custom of authorizing improper and unreliable investigations of civil rights and Title IX claims.

177.     Defendant GCCC, by and through its final policymakers, had in force and effect during the years 2018 to the present, and for years before, a policy, practice, or custom practice to ignore and fail to accept Title IX complaints.

178.     Defendant GCCC, by and through its final policymakers, had in force and effect during the years 2018 to the present, and for years before, a policy, practice, or custom of chilling the First Amendment rights of individuals who spoke out against the College's unlawful practices.

179.     Defendant GCCC, by and through its final policymakers, had in force and effect during the years 2018 to the present, and for years before, a policy, practice, or custom of failing to adequately supervise or discipline its administrative personnel.

180.     Final policymakers for GCCC had actual or constructive notice of these unconstitutional policies. The continued adherence to these unconstitutional customs, practices and/or policies amounted to deliberate indifference to the constitutional rights of Plaintiff and others who are similarly situated.

181.    Despite repeated opportunities to do so in 2018 and for years beforehand, final policymakers for GCCC failed to adequately supervise, discipline, and train its officials with respect to Title IX and constitutional protections.

182.    The egregious acts of Swender and other officers were deliberately ignored by GCCC as multiple officers and policymakers knew about the misconduct but either encouraged it or turned a blind eye.

183.    Final policymakers for GCCC knew that failing to act would be substantially certain to result in constitutional violations including, but not limited to retaliation, Freedom of Speech, Petition and Association and Equal Protection, and that Plaintiff would be harmed thereby.

184.    Final policymakers for GCCC, through the continued encouragement, ratification, and/or approval of the aforementioned policies, customs, and/or practices, in spite of their known and obvious inadequacies and dangers, have been deliberately indifferent to Plaintiff and other individuals' constitutional rights.

185.    Such unconstitutional municipal customs, practices and/or policies were the moving force for the retaliation and harm Plaintiff suffered, as well as all the other grievous injuries and damages set forth above.

WHEREFORE, Plaintiff prays for an award of actual damages against Defendants in an amount in excess of $75,000, under the Constitution and 42 U.S.C. § 1983, fully compensating Plaintiff for the damages suffered as a direct and proximate result of Defendants' unjustified actions, an award of interest and costs of suit, including reasonable attorney fees pursuant to 42 U.S.C. § 1988, punitive damages as justified, and such other and further relief as the Court finds just and proper.

## COUNT IV: CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS
## UNDER 42 U.S.C. § 1985

Plaintiff v. Herbert Swender, individually and all named Trustees in their individual capacities

186.    Plaintiff incorporates by reference the facts and allegations set forth in all preceding paragraphs as if fully set forth here.

187.    Plaintiff at all times relevant hereto sought to and did exercise her free speech, association and petition rights under the First and Fourteenth Amendments on campus, with the media, and by her association with members of the class identified herein.

188.    The Trustee Defendants each expressed their displeasure with sufficient clarity and on so many occasions relevant hereto and during the time frame April 2018 through the present that the quantity and quality of evidence will sufficiently corroborate the existence of their personal animus against Plaintiff related to her exercise of her First and Fourteenth Amendment rights.  They did not like her speech, the speech of her class members they perceived she was associated with and they did not like the petitioning that was done on her behalf by many in the community also identified with the class, on the subject of women's rights on the campus.

189.    The acts Plaintiff complains of were motivated by personal animus of Defendant Swender, and by each Named Trustee against Plaintiff.  Each Defendant is sued in their individual capacities, i.e., Herbert Swender, Blake Wasinger, Merilyn Douglass, Teri Worf, Steve Martinez and Jeff Crist.

190.    Because Plaintiff was associated with those members of the class who spoke up at GCCC for women's rights, at all relevant times hereto, she became a target for disparate and unlawful treatment because of her association, while other members of the class who were less outspoken were treated more fairly or were not singled out for mistreatment at all.

191.    All Defendants and perhaps unknown others associated with Defendants knew, identified, or thought Plaintiff was a member of a class of one or a class of more than one individuals who are outspoken about GCCC and about the college's leadership, employees, agents or allies treatment of women on its campus, in its programs or associated with its events. This is an identified class entitled to the protection of civil rights under the Equal Protection clause.

192.    Plaintiff is identified by all Defendants and perhaps unknown others associated with Defendants, as a class of one or more persons who publicly stood up for herself when she was singled out for discriminatory mistreatment because of her gender or because she was perceived to be associated with those who supported and advocated for better enforcement of Title IX rights at GCCC, for better treatment of women and their rights at GCCC, and she spoke critically at times of the College, its administrators, staff, faculty and/or specifically Defendant Swender and/or the five named trustee Defendants on this subject.  This is an identified class entitled to the protection of civil rights under the Equal Protection clause.

193.    All Defendants and perhaps unknown others associated with Defendants, overtly expressed their animus against Plaintiff at public meetings, in private conversations, through written instruments, texts, emails, and through visible and obvious body language Defendants exhibit at times when they discussed Plaintiff's circumstances.

194.    Defendants comprised an organized conspiracy to violate Plaintiff's civil rights. Each had the motivation, then they expressed the motivation, and exhibited the animus against Plaintiff to form a meeting of the minds involving two or more people and the alleged conspiracy was carried out by agreement between each named Trustee Defendant, Swender or perhaps including others.

195.    And the aim of the conspiracy agreement, motivated by the requisite ill will, was an intent to deprive Plaintiff of her civil rights.

196.    The actionable offense, the aim of the conspiracy, against Plaintiff which was done unlawfully, violated her civil rights, deterred and/or restricted her rights to freedom of speech, association and petition by punishing her for her association with members of her class, publishing false information casting her in a negative light to damage her economic opportunities and athletic career, and using the powers of the state or allowing Swender to use the powers of the state they were supposed to oversee to engage law enforcement in a scare tactic on May 3, to use a Title IX investigator as a form of Title IX harassment on April 13, and castigate Plaintiff for speaking with the media.  Trustees and College administrators intended to deter her from speaking against or petitioning Defendants about Title IX or other women's rights issues on the GCCC campus and from associating with a class identified as supporters of women's rights to keep her subjugated to their state authority and cover up for their wrongs.

197.    The mechanisms that were misused, as applied, were among other matters, their resolution at the January 2019 meeting to adopt then publish the flawed investigator report, the issuance of a No Trespass Notice against Douglass to keep the two separated from one another, the misuse of a Title IX investigator, the misuse of a law enforcement officer or officers, and threats regarding speaking to the media and the fact the College is a state sponsored and supported entity makes these curtailments the misuse of state authority by state actors.

198.    Plaintiff asserts the aim of the conspiracy was accomplished at different times, when Douglass and Tiumalu were not allowed to meet on campus after April 25, 2018 through mid-July 2018, when the vote was taken in January 2019, when the Title IX investigator

confronted her on April 13, 2018, when the law enforcement officer/s came to her dorm room on May 3, 2018, and perhaps at other as yet undisclosed times.

199.     She alleges the conspiracy caused her injuries and the deprivation of her civil rights to freedom to petition government, freely associate with others and not feel threatened thereby, and deprivation of her free speech rights on campus.  The deprivation was a chilling prior restraint on her speech and she has no effective due process procedure at GCCC to have responded to these acts.  It was intended to harm her by unlawfully controlling her speech to the media and other officials.

200.     Defendants, each of them named in the Count, exhibited and expressed personal animosity toward Plaintiff on the basis of her class identification.  While Defendants Wasinger and Douglass wrongfully blamed this class for financial harm to the College, which included Plaintiff, and used language that was demeaning and reflected their personal animus toward civil rights supporters.

201.     By clear inference they or others who heard their or the College leadership's comments and condoned them were referring to Plaintiff and likely to other similarly situated, and the inferences were understood as such.

202.     Plaintiff was deprived of the right to Equal Protection of the law as specified, as well as her First Amendment, Fourteenth Amendment and Due Process rights, and she suffered specific and serious injury, emotional distress, and was otherwise damaged and injured because of Defendants' conspiracy.

WHEREFORE, Plaintiff prays for an award of actual damages against Defendants in an amount in excess of $75,000, under the Constitution and 42 U.S.C. § 1985, fully compensating Plaintiff for the damages suffered as a direct and proximate result of Defendants' unjustified

actions, an award of interest and costs of suit, including reasonable attorney fees pursuant to 42

U.S.C. § 1988, punitive damages as justified, and such other and further relief as the Court finds

just and proper.

### COUNT V: CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS
### UNDER 42 U.S.C. § 1985(2)
Plaintiff v. Defendants Wasinger and Douglass in individual capacities

203.    Plaintiff incorporates by reference the facts and allegations set forth in all

preceding paragraphs as if fully set forth here.

204.    Defendants Wasinger and Douglass not only violated Plaintiff's Equal Protection

rights under § 1985(3), but they also violated two aspects of § 1985(2) and conspired to obstruct

the due course of justice, state and federal.

205.    On two occasions in June 2020, at Board of Trustees meetings Defendants

Wasinger and Douglass in exchanges that appear preplanned or with prepared notes engaged in

what Plaintiff alleges is a conspiracy to deter by intimidation and threat both parties (Plaintiff)

and witnesses in this federal court from attending or testifying freely, fully and truthfully herein.

They conspired to violate 42 U.S.C. § 1985(2)'s first clause.

206.    They accomplished their threats and intimidation by deriding as bad people,

essentially pariahs in the Garden City community, anyone who brought civil rights claims

against the College in the course of the last two years associated with the issues relevant herein.

They inferred that anyone who brings civil rights claims or testifies in support of such claims are

damaging the College, the students and destroying faculty and staff jobs because those were the

consequences of the insurance rate hikes wrought upon the College due directly to the civil rights

claims.

207.    The clear objects of their blame and shame statements are to deter by intimidation or threat witnesses from associating with Plaintiff and providing testimony as witnesses because to do so would assist in harming the financial interests of the College, which is a bad act.

208.    They also conspired to violate 42 U.S.C. § 1985(2)'s third and/or fourth clauses by the same behaviors, intending to impede, hinder, obstruct or defeat in any manner the due course of justice in Kansas with the intent to deny Plaintiff Equal Protection of the laws or injure her or her property interests for lawfully enforcing or attempting to enforce the rights of women students to Equal Protection of the laws.

209.    Plaintiff is identified by Defendants as a class of one or a member of a class of persons who advocate for women's civil rights and she has been attempting to enforce these Equal Protection rights at GCCC for two years or more.

210.    Plaintiff has been retaliated against by Defendants as set forth herein for the purposes of impeding, hindering, obstructing or defeating the due course of justice given the examples detailed throughout each count and the facts above, which are incorporated herein.

211.    Plaintiff has been harmed by loss of her Free Speech, Petition and Association rights as well as facing derogatory claims that she is responsible for financial harm to the College affecting its student offerings and employee job losses.

WHEREFORE, Plaintiff prays for an award of actual damages against Defendants in an amount in excess of $75,000, under the Constitution and 42 U.S.C. § 1985, fully compensating Plaintiff for the damages suffered as a direct and proximate result of Defendants' unjustified actions, an award of interest and costs of suit, including reasonable attorney fees pursuant to 42 U.S.C. § 1988, punitive damages as justified, and such other and further relief as the Court finds just and proper.

**COUNT VI: KANSAS CONSUMER PROTECTION ACT VIOLATIONS**
**K.S.A. § 50-623 et seq.**
Plaintiff v. GCCC

212.    Plaintiff incorporates by reference the facts and allegations set forth in all preceding paragraphs as if fully set forth here.

213.    Plaintiff is a consumer as defined in the Kansas Consumer Protection Act, K.S.A. § 50-623 et seq. ("KCPA").

214.    Defendant Garden City Community College is a supplier as defined in the KCPA.

215.    Plaintiff asserts and alleges that in the fall of 2016 and continuing thereafter on various occasions in 2017, 2018 and 2019, she was a consumer, who became the victim of unconscionable acts and/or practices of GCCC and/or deceptive acts and/or practices of GCCC as a supplier, defined in the KCPA, and detailed herein.

216.    She was recruited by Coach Jacque Matula in the Fall of 2016 to attend GCCC on a women's volleyball scholarship, which was represented to Plaintiff as a materially valuable property or service of the College, because she would be given room, board, tuition, fees and books, called a full-ride scholarship, in athletic parlance, making GCCC's offer superior to some other institutions seeking to engage or lure Plaintiff, a consumer of educational services, to attend the school.

217.    Matula represented she had the requisite authority on behalf of GCCC to make this offer.

218.    Later, in 2016 and 2017, John Green, athletic director of GCCC, ratified Matula's offer in each subsequent school year.

219.    GCCC actually paid in full to the best of Plaintiff's knowledge, information and belief all of her room, board, tuition and books and fees until she received an unexpected "bill" in the year 2017 or early 2018, which amounted to $8506 by January 2018.

220.    This was not the consumer transaction she bargained for in 2016 or thereafter.

221.    She told GCCC through Green and Matula in 2017 and thereafter that she expected GCCC to perform as it promised when it convinced her to attend beginning in 2016, knowing she had no funds or means to attend school without such a full ride scholarship.

222.    She alleges GCCC violated the KCPA's provisions under §50-626 (b)(1)(A) by virtue of misleading her with representations made knowingly or with reason to know that the property or services GCCC offered had approval, characteristics, uses or benefits that they did not have when Matula, Green, and/or others, knew or should have known, GCCC did not have and/or they did not have a right to make assurances GCCC did have approval, characteristics, uses or benefits based on the facts KJCCC (the athletic association GCCC belongs to) had rules specifically prohibiting room and board to any scholarship athlete at the time.  Plaintiff was offered a full-ride scholarship in a College Association that did not permit GCCC to offer full-ride scholarships.

223.    In Plaintiff's dealings with GCCC administrators they kept making misrepresentations about the scholarships approval, characteristics, uses and benefits in ways to keep Plaintiff in the dark, reassure her that she was entitled to these benefits and would not be sanctioned for her receipt of these benefits or otherwise harmed by accepting the assurances of her College leaders that a full-ride scholarship was available to her.

224.    She alleges further that although she signed agreements that did not align with these representations, she was not given copies of those agreements she signed and therefore was kept in the dark about exactly what was offered and promised by GCCC through its agents.

225.    Plaintiff alleges GCCC violated the KCPA § 50-626(b)(2) and (3) by the willful use, in oral representations, of exaggeration, falsehoods, innuendo or ambiguity as to material facts, specifically advising her she had a full-ride scholarship after she signed agreements that belied these post-contract assurances in order to get or keep Plaintiff attending GCCC and playing women's volleyball.  GCCC also willfully failed to state through its agents, Green, Matula and others, the proper material facts, and they willfully concealed, suppressed or omitted material facts from Plaintiff associated with her consumer transaction on more than one occasion during the course of her attendance at GCCC from 2016 to 2019.

226.    Plaintiff was damaged by these misrepresentations and deceptive acts and practices by fulfilling her part of the bargain and playing volleyball for GCCC, while GCCC knew their hidden bills would eventually be handed to her with the expectation that she would pay or get school loans to do so.

227.    Plaintiff was presented with the "bills" beginning on or about late 2018 into 2019 and they mounted over time going from $8506 to over $13,000 by 2019.

228.    Plaintiff alleges GCCC also engaged in unconscionable acts or practices in connection with her consumer transaction when the supplier GCCC through its authorized agents, Green, Matula, and others, induced her to enter into this arrangement which was excessively one-sided in favor of the supplier per § 50-627(b)(5).

229.    Plaintiff alleges GCCC also engaged in unconscionable acts or practices in connection with her consumer transaction when the supplier GCCC took advantage of her

inability to reasonably protect her interests because of her inability to understand the smoke screen and manipulative language used in the agreement and they kept her from having copies of what she signed per § 50-627(b)(1).

230.    Under § 50-627(b)(3) the College knew that eventually they would have created a circumstance where Plaintiff was unable to receive a material benefit from the subject of the transaction because unless or until she paid the hidden bill that would not be given to until late 2017 or early 2018 she would not be able to graduate, get her transcripts and transfer to a different school, which is key component for why students attend community colleges—to matriculate to a 4 year institution.  GCCC knew or intended that she expend time, effort, and play volleyball for the College before she would or could discover this inability to receive a material benefit from the transaction.  She would be too far into her schooling before she knew what the administrators had caused to be done to her through the improper acts of GCCC's agents, Green, Matula and others.

231.    Under both §§ 50-627 (b)(5) and (6) GCCC knew their inducements or misleading statements of opinion were excessively one-sided and that she was likely to rely to her detriment on their misleading statements, assurances and directives because they were in a position of authority over her college career and as coaches, athletic director and president there was the difference in authority and team members are supposed to cooperate and follow orders, not question their leaders or else.  The situation is inherently weighted in favor of the administrators and against student athletes, which GCCC knew and took advantage of that fact.

232.    Plaintiff has been damaged by this transaction and she was unable to protect herself from GCCC's deceptive and unconscionable acts due to the imbalance of power.

233.    Plaintiff seeks all relief and remedies available to her under the KCPA.  She seeks a finding that she does not owe GCCC for all sums they claim she owes.

WHEREFORE, Plaintiff prays for an award of compensatory and actual damages against Defendants in an amount in excess of $75,000, under the KCPA, fully compensating Plaintiff for the damages suffered as a direct and proximate result of Defendants' unjustified actions, an award of interest and costs of suit, including reasonable attorney fees pursuant to the Act, punitive damages as justified, and such other and further relief as the Court finds just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates the place of trial in Kansas City, Kansas.

Respectfully submitted,

/s/ Jean Lamfers
Jean Lamfers, KS #12707
Lamfers & Associates, L.C.
7003 Martindale
Shawnee, KS 66218
Tel.: (913) 962-8200
jl@lamferslaw.com

/s/ Sarah A. Brown
Sarah A. Brown, KS #12130
Brown & Curry, LLC
1600 Genessee Street, Suite 956
Kansas City, MO 64102
Tel.: (816) 756-5458
Fax: (816) 666-9596
sarah@brownandcurry.com

ATTORNEYS FOR PLAINTIFF