## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| SHANEY TIUMALU, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| v. | ) | |
| | ) | No. 20-2193-KHV |
| GARDEN CITY COMMUNITY | ) | |
| COLLEGE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

On July 22, 2020, Shaney Tiumalu filed an amended complaint against Garden City
Community College ("GCCC"), Herbert J. Swender, Merilyn Douglass, Blake Wasinger, Jeff
Crist, Steve Martinez and Teri Wolf.  Plaintiff alleges retaliation under Title IX, 20 U.S.C. § 1681
et seq.; violations of federal civil rights under the First and Fourteenth Amendments, U.S. Const.
amends. I, XIV, and 42 U.S.C. § 1983; and violations of the Kansas Consumer Protection Act,
K.S.A. § 50-623 et seq.  First Amended Complaint (Doc. #7).  This matter is before the Court on
defendants' Motion To Dismiss Plaintiff Tiumalu's Claims (Doc. #25) filed October 9, 2020,
pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the Court
sustains in part and overrules in part defendants' motion.

## Legal Standard

In ruling on a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., the Court assumes as
true all well-pleaded factual allegations and determines whether they plausibly give rise to an
entitlement of relief.  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  To survive a motion to dismiss,
a complaint must contain sufficient factual matter to state a claim which is plausible—not merely
conceivable—on its face.  Id. at 679–80; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

In determining whether a complaint states a plausible claim for relief, the Court draws on its judicial experience and common sense.  Iqbal, 556 U.S. at 679.  The Court need not accept as true those allegations which state only legal conclusions.  See id.

Plaintiff bears the burden of framing her claim with enough factual matter to suggest that she is entitled to relief; it is not enough to make threadbare recitals of a cause of action accompanied by conclusory statements.  See Twombly, 550 U.S. at 556.  Plaintiff makes a facially plausible claim by pleading factual content from which the Court can reasonably infer that defendants are liable for the alleged misconduct.  Iqbal, 556 U.S. at 678.  Plaintiff must show more than a sheer possibility that defendants have acted unlawfully—it is not enough to plead facts that are "merely consistent with" defendants' liability.  Id.  (quoting Twombly, 550 U.S. at 557).  A pleading which offers labels and conclusions, a formulaic recitation of the elements of a cause of action or naked assertions devoid of further factual enhancement will not stand.  Id.  Similarly, where the well-pleaded facts do not permit the Court to infer more than the mere possibility of misconduct, the pleading has alleged—but has not "shown"—that the pleader is entitled to relief.  Id. at 679.  The degree of specificity necessary to establish plausibility and fair notice depends on context because what constitutes fair notice under Rule 8(a)(2), Fed. R. Civ. P., depends on the type of case.  Robbins v. Oklahoma, 519 F.3d 1242, 1248 (10th Cir. 2008).

When ruling on a Rule 12(b)(6) motion, the Court does not analyze potential evidence that the parties might produce or resolve factual disputes.  Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002).  The Court accepts well-pleaded allegations as true and views them in the light most favorable to the non-moving party.  Sutton v. Utah State Sch. For Deaf & Blind, 173 F.3d 1226, 1236 (10th Cir. 1999).

**Factual Background**

Plaintiff's amended complaint alleges the following:

Starting in the fall of 2016, plaintiff was a student at GCCC on a "full ride" women's volleyball scholarship.  First Amended Complaint (Doc. #7), ¶ 11.  She also was a host student to Toni Douglass, a community member and outspoken supporter of women's rights at GCCC.  Id., ¶ 22.  Plaintiff understood the "full ride" scholarship to include tuition, books, room and board, and she knew of male athletes whom GCCC also deemed full ride scholar athletes.  Id., ¶¶ 33, 38. As a member of the Kansas Jayhawk Community College Conference ("KJCCC"), however, GCCC was not allowed to offer scholarships that included room and board to athletes in any sports. Id., ¶ 17.  Yet for the 2016–2017 academic year, GCCC did not bill or seek payment for room and board from plaintiff.  Id., ¶ 36.

In the summer of 2017, the GCCC athletic department and student housing department clashed over accounting for plaintiff's room and board costs.  Id., ¶ 40.  In June of 2017, as GCCC sorted through the billing issue, plaintiff returned to campus and resided in a dorm room for a few days before temporarily moving into the residence of Athletic Director John Green.  Id., ¶¶ 42–43. Plaintiff's coaches instructed her not to discuss her temporary living situation with anyone and assured her that her status as a full ride scholar athlete would be honored.  Id., ¶¶ 44–47.  Plaintiff believed these assurances and did not decide to go elsewhere to play volleyball for the fall.  Id., ¶¶ 47–49.  At the end of July of 2017, at her coach's instruction, plaintiff moved into a dorm and remained in campus housing until she left Garden City in May of 2018.  Id., ¶ 52.  In the fall of 2017, plaintiff enrolled in classes without incident or demand for payment of any "outstanding balance."  Id.

Some time in the fall of 2017, GCCC billed plaintiff for room and board. Id., ¶ 54. She promptly denied to the athletic department and other campus officials that she owed anything. Id. In response, her coach (Jacquelynne Matula) told her that the administration had devised a plan to "help her pay her bill." Id., ¶ 56. On multiple occasions, Coach Matula gave plaintiff cash and told her to take the cash to the business office, apply the cash to her "bill" and then give Coach Matula the receipt. Id., ¶ 57. At the end of the fall semester in 2017, Coach Matula assured plaintiff that she would personally take care of plaintiff's enrollment for the spring semester in 2018. Id., ¶ 62.

In January of 2018, plaintiff returned to GCCC after winter break and discovered that she was not enrolled for the spring semester. Id. Further, GCCC had billed plaintiff more than $8,500 in past fees, including room and board. Id., ¶ 66. GCCC rules dictated that students could not enroll for a new semester if they owed any outstanding balance to the school. Id., ¶ 53. During this time, plaintiff could not take classes but still attended volleyball practice. Id., ¶ 63.

On or about January 16, 2018, plaintiff arranged a meeting with GCCC athletic department staff to (1) get enrolled in classes and (2) get GCCC to zero out its "bill" because she had been promised a full ride scholarship. Id., ¶¶ 64–65. GCCC allowed plaintiff to enroll. Id., ¶ 67. By January 24, 2018, plaintiff was informed that GCCC had taken care of her "bill," would not turn her over to collections for any outstanding account balance and would not place any hold on her account or transcript. Id., ¶¶ 70–71.

On January 25, 2018, plaintiff wrote a letter "To whom it may concern" outlining issues associated with her temporary living arrangements with Athletic Director Green in the summer of 2017. Id., ¶ 76. On or about April 11, 2018, GCCC's HR department received a copy of the letter. Id. The contents of plaintiff's letter triggered two events: (1) a Title IX investigation because

GCCC perceived the letter as containing a potential claim of Title IX sexual harassment[1] and (2) a KJCCC investigation associated with her purported full ride scholarship.  Id., ¶¶ 76, 79.

On or about April 13, 2018, GCCC retained Bev Temaat, a Title IX investigator from Dodge City Community College.  Id., ¶ 79.  Temaat arrived unannounced at plaintiff's dorm at 6:30 p.m. "to review her education records under FERPA."[2]  Id., ¶ 80.  Temaat, along with GCCC's HR Director Emily Clouse, later had a conversation with plaintiff and her mother by phone regarding the Title IX issues.  Id., ¶ 82.  Not long after these incidents, in mid to late April, plaintiff and one of her instructors were in the administration building confirming that her "bill" had been zeroed out and requesting the release of her transcript.  Id., ¶ 101. Plaintiff and the instructor noticed that GCCC President Herbert Swender and HR Director Clouse were watching them, circling them and "staring [them] down."  Id.

In the meantime, on or about April 13, 2018, KJCCC had received an email that was anonymous—but not from plaintiff—detailing plaintiff's temporary living arrangement with Athletic Director Green and GCCC's scholarship misrepresentations.  Id., ¶ 87.  KJCCC also received a copy of plaintiff's letter dated January 25, 2018.  Id., ¶ 88.  KJCCC initiated an investigation of the reported information and requested that GCCC provide a response by early May.  Id.  On or around May 3, plaintiff learned about the KJCCC investigation and that GCCC was likely facing sanctions in its volleyball program.  Id., ¶ 97.  GCCC sent a response to KJCCC

---

[1]       Title IX is a federal civil rights law passed as part of the Education Amendments of 1972 that prohibits discrimination based on sex in education programs or activities that receive federal financial assistance.  See 20 U.S.C. § 1681 et seq.

[2]       The Family Educational Rights and Privacy Act ("FERPA") is a federal law that protects the privacy of student education records and applies to all schools that receive funds under an applicable program of the U.S. Department of Education.  See 20 U.S.C. § 1232g.

dated May 9, 2018, and KJCCC ultimately sanctioned GCCC for its scholarship misrepresentations.  Id., ¶ 88.

On May 3, 2018, an unidentified person from GCCC contacted the Garden City Police Department ("GCPD") and reported that plaintiff was attempting to blackmail or extort GCCC. Id., ¶ 89.  That same day, Detective Freddie Strawder, an employee of GCPD and an adjunct criminal justice instructor at GCCC, along with another officer visited plaintiff in her dorm room. Id., ¶¶ 91–92.  Plaintiff did not engage in a meaningful discussion with them because she felt threatened by two officers coming to her dorm room.  Id., ¶ 93.  At the time, she believed that President Swender had sent the officers to her dorm to "scare her after the Temaat [Title IX] event of April 13, 2018, as well as from earlier scholarship and enrollment issues in January 2018" and that the GCCC Board of Trustees ("Board") endorsed his actions.  Id., ¶¶ 83–97, 167.  After contacting plaintiff, Detective Strawder talked with two GCCC instructors who knew plaintiff and warned them to "watch how involved they were with students [like plaintiff] who had issues" because "it could get them drawn into trouble themselves."  Id., ¶¶ 94–96.  Detective Strawder filed a police report about the incident, dated May 15, 2018.  Id., ¶¶ 90–94.  GCPD then dropped its investigation.  Id., ¶ 99.

On May 8, 2018, the GCCC faculty submitted a Faculty Report that mentioned plaintiff's situation.  Id., ¶ 104.  In response, the Board hired an independent investigator to look into all matters raised in the report.  Id.  The independent investigator did not interview plaintiff, and plaintiff did not cooperate with the investigator.  Id., ¶ 120.  Around the same time, on May 10, GCCC received a request under the Kansas Open Records Act ("KORA"), K.S.A. § 45-215 et seq., asking for the email records of more than 20 people, including plaintiff, who had Title IX issues at GCCC. Id., ¶ 106.  Plaintiff believes that the KORA request was "fake" and that President

Swender had secretly submitted it as "a fishing expedition concerning individuals who might be termed 'critics' of the president." Id., ¶ 107. She also believes that the "fake" KORA request violated FERPA and resulted in President Swender reading her personal emails and invading her privacy. Id., ¶ 158.

Around January of 2019, the Board received the independent investigator's report. Id., ¶¶ 114–19. The report contained "false or unsubstantiated assertions" and details about incidents involving plaintiff without effectively redacting her identity, private records, and information. Id., ¶¶ 120, 126. The Board voted to adopt the report and released it to the public. Id. At some point, plaintiff spoke to the media. Id., ¶ 167. At two Board meetings in June of 2020, Trustees Blake Wasinger and Merilyn Douglass expressed frustration at lawsuits like plaintiff's because they increased GCCC's insurance rates and "wrongfully" harmed the college financially. Id., ¶¶ 134–35. They also inferred that people involved in lawsuits like plaintiff were "bad people" and "essentially pariahs in the Garden City community." Id., ¶¶ 137–38, 206–07. Plaintiff believes that their intimidating comments created "an 'us' against 'them' civil rights based divisiveness." Id., ¶ 138. As a result, plaintiff suffered damage to her athletic and professional career, economic standing and reputation in the community. Id., ¶¶ 128, 158.

Plaintiff left Garden City in 2018, and she did not graduate from GCCC because she was short six credit hours of required courses for graduation.[3] Id., ¶¶ 102–03. Since late 2018 into 2019, GCCC has continued to present plaintiff with "bills" for more than $13,000. Id., ¶ 227.

---

[3]     The exact end-date of plaintiff's enrollment at GCCC is unclear. Plaintiff states that she left Garden City in 2018 but that she attended GCCC through "the Spring of 2019." Id., ¶¶ 18, 103. The Court cannot ascertain whether this inconsistency is an error or if plaintiff possibly attended GCCC classes online while residing in another location. Nonetheless, plaintiff is clear that she ultimately did not graduate from GCCC because she was short six credit hours of required coursework. Id., ¶¶ 102–03. Plaintiff alleges that "she did not foresee" this credit hour issue, but she does not allege that GCCC was at fault. Id.

## Analysis

Plaintiff sues GCCC, GCCC's former President Swender and several GCCC Board of Trustees members alleging the following claims: (1) Title IX retaliation by GCCC in violation of 20 U.S.C. § 1681 et seq.; (2) First Amendment retaliation under the United States Constitution, U.S. Const. amends. I, XIV, and 42 U.S.C. § 1983 by individual defendants in their individual and official capacities, and GCCC under Monell v. Department of Social Services, 436 U.S. 658 (1978); (3) conspiracy to interfere with civil rights under 42 U.S.C. § 1985(2) by Trustees Wasinger and Douglass in their individual capacities; and (4) Kansas Consumer Protection Act violations under K.S.A. § 50-623 et seq. by GCCC.[4]  Defendants move to dismiss plaintiff's complaint in its entirety for failure to state a claim.  In the alternative, they move to dismiss as redundant plaintiff's official capacity claims against individual defendants and to dismiss under qualified immunity plaintiff's First Amendment retaliation and Section 1985(2) conspiracy claims against individual defendants.  See, e.g., N.E.L. v. Douglas Cty., Colo., 740 F. App'x 920, 928 (10th Cir. 2018) (detailing threshold to overcome qualified immunity).

Defendants generally argue that (1) plaintiff has failed to sufficiently plead facts to support her claims and (2) the documents that plaintiff "incorporated by reference" but did not include in her amended complaint demonstrate that plaintiff is misstating alleged facts.  Specifically, in her amended complaint, plaintiff "incorporates by reference" the Faculty Report issued on May 8, 2018; multiple public videos of the Board of Trustees' meetings; the KORA request; the GCPD report about plaintiff's blackmail allegation; and the independent investigator's report.  First

---

[4]       Plaintiff voluntarily dismissed without prejudice (1) the Section 1985(3) claims for conspiracy, numbered in her amended complaint as Count IV and (2) the Section 1985(2) claims under Clauses C and D for conspiracy, located in her amended complaint under Count V. Response By Plaintiff Shaney Tiumalu (Doc. #37) at 7 n.6, 36.

Amended Complaint (Doc. #7), ¶¶ 28, 77, 90, 95, 113, 125.  She did not include them in the amended complaint or attach them as exhibits.  On a motion to dismiss, the Court cannot legally consider extrinsic evidence outside the complaint.  See Fed. R. Civ. P. 12(d); see, e.g., GFF Corp. v. Associated Wholesale Grocers, Inc., 130 F.3d 1381, 1384 (10th Cir. 1997) (court must exclude outside material unless motion converted to one for summary judgment under Rule 56).  Further, while the Court may take judicial notice of matters in the public record such as the Board's public meeting videos, such notice is limited to the document's existence, not its accuracy.  More to the point, under Rule 8(a), Fed. R. Civ. P., a pleading that states a claim for relief must contain a "short and plain statement of the claim."  Evaluated against that standard, the extensive purported "incorporations by reference" are surplusage, immaterial and impertinent.  Accordingly, under Rule 12(f)(1), Fed. R. Civ. P., the Court strikes these references from plaintiff's amended complaint and does not consider them in deciding defendants' motion to dismiss.

The Court now will consider each claim in turn.

## I.      Title IX Retaliation

Plaintiff alleges that GCCC violated her rights to be free from retaliation under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 et seq.  To state a claim for retaliation under Title IX, plaintiff must allege that (1) she engaged in protected activity; (2) GCCC knew of the protected activity; (3) GCCC took materially adverse school-related action against plaintiff; and (4) a causal connection occurred between the protected activity and the adverse action.  Tackett v. Univ. of Kan., 234 F. Supp. 3d 1100, 1109 (D. Kan. 2017); C.T. v. Liberal Sch. Dist., 562 F. Supp. 2d 1324, 1336 (D. Kan. 2008).

GCCC challenges only the third element—whether its action was materially adverse.  An action is materially adverse if it may have dissuaded a reasonable person from making or

supporting a charge of discrimination.  Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006); Tackett, 234 F. Supp. at 1108–09 (applying Title VII framework to Title IX cases). A materially adverse action produces injury or harm that is more than trivial or a mere inconvenience.  Burlington Northern, 548 U.S. at 68; Wheeler v. BNSF Ry. Co., 418 F. App'x 738, 750 (10th Cir. 2011).

Plaintiff alleges the following adverse actions: (1) the Board published the independent investigator's report which included plaintiff's name and "misleading facts and [a] privacy invading narrative" and sabotaged plaintiff's athletic and professional career; (2) in publishing the independent investigator's report, the Board threatened plaintiff's "economic standing" and subjected her to "continuing whisper campaigns"; (3) President Swender submitted a "fake" KORA request to give himself access to plaintiff's student emails; (4) GCCC mishandled plaintiff's scholarship situation and Title IX allegation, which led to KJCCC sanctioning the volleyball program and plaintiff being deprived of associations with friends, teammates and colleagues; and (5) President Swender lodged false blackmail charges against plaintiff with the GCPD and orchestrated the officers' visit to plaintiff's dorm to dissuade her from making charges of civil rights violations and discrimination.  First Amended Complaint (Doc. #7), ¶ 158.

GCCC generally argues that such actions are not materially adverse because (1) the documents that plaintiff "incorporated by reference" prove that she is misstating the facts surrounding these actions and (2) plaintiff did not plead sufficient evidence to demonstrate how the actions produced more than trivial harm.  Memorandum In Support Of Motion To Dismiss By Defendants (Doc. #26) at 8–15. The Court disagrees.  First, as discussed, the Court does not consider the "incorporated" documents and assumes the truth of the facts alleged in the amended complaint.  Second, in the context of a motion to dismiss, plaintiff must put defendants on notice

of her claims, not plead all of her evidence.  See Fed. R. Civ. P. 8(a).  Here, plaintiff sufficiently pleads facts illustrating the harms or injuries that resulted from each allegedly materially adverse action. As to the first two, plaintiff pleads that the independent investigator's falsified report threatened her athletic and professional career, economic standing and reputation.  Id., ¶¶ 128, 158. As to the third, plaintiff pleads that the "fake" the KORA request violated FERPA and resulted in President Swender violating her privacy rights.  Id., ¶ 158. As to the fourth, plaintiff pleads that GCCC's actions deprived her of associations with friends, teammates and colleagues.  Id.  As to the fifth, plaintiff pleads that President Swender's false blackmail charge resulted in police officers intimidating and harassing both her and her instructors.  Id., ¶¶ 90–99.  Viewed in the light most favorable to plaintiff, these alleged harms are more than trivial or mere inconveniences.  Burlington Northern, 548 U.S. at 68; Wheeler, 418 F. App'x at 750.  The Court therefore overrules defendants' motion to dismiss plaintiff's Title IX retaliation claims.

## II.    First Amendment Retaliation

Plaintiff alleges that GCCC and the individual defendants, in both their individual and official capacities, violated her First Amendment rights of speech, association and petition in a series of animus-based retaliatory acts which they carried out because they blamed her for disclosing official misconduct and holding them accountable.  See U.S. Const. amends. I, XIV; 42 U.S.C. § 1983; First Amended Complaint (Doc. #7), ¶ 167.  To state a claim for First Amendment retaliation, plaintiff must show that (1) she was engaged in constitutionally protected activity; (2) defendants' actions caused plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) plaintiff's exercise of constitutionally protected conduct substantially motivated defendants' adverse action.  Van Deelen v. Johnson, 497 F.3d 1151, 1155–56 (10th Cir. 2007); Worrell v. Henry, 219 F.3d 1197, 1212–13 (10th Cir.

2001) (establishing the Worrell framework).  As noted, plaintiff brings this claim against (1) the individual defendants in their individual and official capacities and (2) GCCC directly under Monell.

Plaintiff alleges the following constitutionally protected activities and retaliatory actions: (1) defendants retaliated against plaintiff to deter and punish her for speaking to the media; (2) in an attempt to discourage her speech, defendants pressured plaintiff not to associate with her host mom Toni Douglass, and President Swender and Athletic Director Green interfered with plaintiff's friendships; (3) in an attempt to harm plaintiff, hold her up to ridicule and blame her for GCCC's financial harm, Trustees Wasinger and Douglass spoke about lawsuits like plaintiff's in at least two Board meetings in June of 2020; (4) because plaintiff spoke or raised issues to their displeasure, the Trustees failed to protect plaintiff from infringement of her constitutional rights to associate, petition and exercise free speech; (5) defendants voted to accept the independent investigator's report that included information about how President Swender or someone on his behalf sent GCPD officers to arrest plaintiff for her outstanding debt and for the fake blackmail claim; and (6) defendants were aware of and failed to stop President Swender from sending the Title IX investigator and GCPD officers to plaintiff's dorm to harass her and then published the independent investigator's report with plaintiff's name.  First Amended Complaint (Doc. #7), ¶ 167.

Defendants seek to dismiss these claims on the following grounds: (1) plaintiff did not sufficiently plead constitutionally protected speech activity or how defendants' actions caused her injury that would chill a person of ordinary firmness from continuing to engage in that activity; (2) the individual defendants are entitled to qualified immunity because the law is not clearly established in this district; (3) GCCC cannot be held liable under Monell because its employees

committed no constitutional violations and the underlying Section 1983 claim therefore fails; and (4) plaintiff's official capacity claims against the individual defendants are redundant. <u>Memorandum In Support Of Motion To Dismiss By Defendants</u> (Doc. #26) at 8, 15–23. The Court will address each of defendants' arguments in turn.

### A.      First Amendment Retaliation Allegations

Defendants first argue that plaintiff did not sufficiently plead constitutionally protected speech activity or injuries to satisfy the <u>Worrell</u> framework.  <u>Id.</u> at 15–21; <u>see</u> <u>Worrell</u>, 219 F.3d at 1212–13.  Defendants contend that plaintiff "identifies no protected conduct" and that any mention to speech activity fails to identify the time, date or manner of the communication. <u>Memorandum In Support Of Motion To Dismiss By Defendants</u> (Doc. #26) at 16.  Defendants further argue that plaintiff did not provide sufficient facts to show how pressuring someone to not speak to a community member, failing to act or discussing student lawsuits at a public board meeting are materially adverse actions.  <u>Id.</u> at 16–20.

The Court disagrees.  First, plaintiff alleges constitutionally protected speech activity in the form of Title IX letter dated January 25, 2018, and speaking to the media.  <u>First Amended Complaint</u> (Doc. #7), ¶¶ 76, 167.  Second, in the context of a motion to dismiss, plaintiff need only put defendants on notice of her claims, not plead all of her evidence.  Here, plaintiff sufficiently pleads facts illustrating how defendants' actions caused plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to report her Title IX issues.  <u>Worrell</u>, 219 F.3d at 1212–13.  As to the first allegation, defendants sought to "deter and punish" plaintiff from speaking to the media through scare tactics like President Swender's fake blackmail allegation.  <u>First Amended Complaint</u> (Doc. #7), ¶ 167.  As to the second allegation, defendants pressured plaintiff to not associate with her host mom Toni Douglass or her friends so she would be isolated and stay

quiet.  Id., ¶ 167.  As to the third allegation, Trustees Wasinger and Douglass blamed people like plaintiff for GCCC's economic hardships, which intimidated plaintiff and deterred her from speaking out.  Id., ¶¶ 134–40, 167.  As to the fourth allegation, because plaintiff openly criticized GCCC, the Trustees engaged in retaliatory actions such as voting to accept the flawed report that maligned plaintiff.  Id., ¶¶ 120, 126, 167.  As to the fifth and sixth allegations, President Swender's false blackmail allegation, and the Trustees' refusal to stop his behavior, resulted in police harassing and intimidating plaintiff and her instructors.  Id., ¶¶ 90–95, 167.  The Court therefore overrules defendants' motion to dismiss plaintiff's First Amendment retaliation claims.

### B.      Qualified Immunity

In the alternative, defendants argue that the individual defendants (President Swender and Trustees Douglass, Wasinger, Crist, Martinez and Worf) are entitled to qualified immunity on plaintiff's First Amendment retaliation claims because "the law is not clearly established in this district" and defendants "are unaware of any caselaw that would put the Individual Defendants on notice that any of their actions discussed above violated clearly established law."  Memorandum In Support Of Motion To Dismiss By Defendants (Doc. #26) at 22–23.  To overcome an official's qualified immunity, plaintiff must demonstrate that (1) the official violated a statutory or constitutional right and (2) the law clearly establishes that right.  See N.E.L., 740 F. App'x at 928.  A right is clearly established when every reasonable official would understand that what he or she is doing violates that right.  Id. at 928–29.  Once plaintiff establishes an inference that defendants' conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 876–77 (10th Cir. 1993).

Here, plaintiff has sufficiently pled that (1) she was engaged in protected First Amendment activities when she reported the Title IX violations and (2) President Swender, with the knowledge

of the Trustees, subjected her to retaliatory treatment.  First Amended Complaint (Doc. #7), ¶¶ 83–97, 167.  The law is clear and the Supreme Court more than fifty years ago set the standard: school authorities may not penalize students for speech which is non-disruptive, non-obscene and not school-sponsored.  See Tinker v. Des Moines Ind. Cmty. Sch. Dist., 393 U.S. 503, 508–09 (1969) (school authorities cannot punish students for exercising freedom of expression where speech does not "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school" or intrude on rights of other students; "undifferentiated fear or apprehension of disturbance" not enough to overcome right to freedom of expression).  Cf. Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 273 (1988) (school authorities can exercise greater control over students' speech when it involves "school-sponsored expressive activities"); Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 685 (1986) (school authorities could penalize student for lewd and indecent speech). The geographical scope of the test clearly encompasses plaintiff's claims.

In particular, plaintiff alleges that after GCCC received her Title IX letter, President Swender orchestrated the fake blackmail allegation and intimidating investigation by the GCPD, and the Trustees endorsed his actions.  First Amended Complaint (Doc. #7), ¶¶ 83–97, 167.  A reasonably competent public official would necessarily know that such retaliatory behavior violated plaintiff's First Amendment rights.  See, e.g., Seamons v. Snow, 206 F.3d 1021, 1029–31 (10th Cir. 2000).  Thus, the individual defendants are not entitled to qualified immunity based on a lack of clear law in this district.  Defendants' motion to dismiss the First Amendment retaliation claims against the individual defendants is therefore overruled.

### C.      GCCC's Liability Under <u>Monell</u>

Plaintiff alleges that under <u>Monell</u>, GCCC is liable for constitutional violations by GCCC employees under GCCC custom or policy.  <u>First Amended Complaint</u> (Doc. #7), ¶¶ 171–85; <u>Monell</u>, 436 U.S. at 694.  Local governments or municipalities, including GCCC, can be held liable for their employees' actions if they were taken pursuant to GCCC's "official policy."  <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 479 (1986); <u>Monell</u>, 436 U.S. at 694.  To allege liability under <u>Monell</u> and its progeny, plaintiff must allege (1) a constitutional violation by a municipal employee, (2) the existence of a municipal custom or policy and (3) a direct causal link between the custom or policy and the violation alleged.  <u>See</u> <u>Monell</u>, 436 U.S. at 694; <u>Hinton v. City of Elwood, Kan.</u>, 997 F.2d 774, 782 (10th Cir. 1993).

Defendants argue that plaintiff "does not allege a single act taken by any employee under any GCCC policy that violated any alleged right of the Plaintiff" and that <u>Monell</u> liability "appears to be pleaded as factual support for the alleged First Amendment and Title IX violations." <u>Memorandum In Support Of Motion To Dismiss By Defendants</u> (Doc. #26) at 23.  Defendants contend that because the underlying employees committed no constitutional violations, plaintiff cannot hold GCCC liable under <u>Monell</u>.  <u>Id.</u>

As stated above, plaintiff sufficiently alleges that GCCC's employees—President Swender and the Trustees—violated plaintiff's constitutional rights when they retaliated against her for reporting Title IX issues.  The retaliation included publishing an unredacted, falsified report that threatened plaintiff's academic and professional careers and employing scare tactics, including President Swender's fake blackmail allegation and Trustees Wasinger and Douglass' intimidating public comments.  <u>See, e.g.</u>, <u>First Amended Complaint</u> (Doc. #7), ¶¶ 90–95, 120–26, 135–40, 167. Further, plaintiff alleges that these retaliatory actions were based on GCCC's Title IX policy or

custom to silence critics and not investigate or to inadequately investigate Title IX activity.  Id., ¶¶ 75–86, 146, 148.  Because plaintiff has alleged that the retaliatory conduct of President Swender and the Trustees was taken pursuant to GCCC's Title IX policy, GCCC may be subject to municipal liability if the underlying conduct violated the Constitution.  The First Amendment retaliation claim against GCCC therefore survives under Monell.

### D.   Official Capacity Claims

Plaintiff asserts her First Amendment retaliation claims against President Swedner and the Trustees (Douglass, Wasinger, Crist, Martinez and Worf) both in their individual and official capacities.  Id., ¶ 167.  Defendants argue that the claims against President Swender and the Trustees in their official capacities are redundant in view of the claim against GCCC.  Memorandum In Support Of Motion To Dismiss By Defendants (Doc. #26) at 8.  In response, plaintiff contends that the official capacity claims are not redundant because their scope of recoverable damages is broader than the scope of recoverable damages against GCCC—namely, punitive damages are not permitted in suits against municipalities but are available against individuals sued in their official capacities.  Response By Plaintiff Shaney Tiumalu (Doc. #37) at 39.  Plaintiff relies on Youren v. Tintic School District, 343 F.3d 1296 (10th Cir. 2003), where the Tenth Circuit found sufficient evidence to warrant a trial on punitive damages against an individual defendant in her official capacity.[5]

Courts in this district have routinely dismissed official capacity claims as redundant when the local government or municipality is also a defendant, and have rejected the argument that

---

[5]      The Court notes that in Youren, the question was not whether the claims were duplicative, but whether the official capacity damages amounted to "impermissible double recovery."  343 F.3d at 1306.  The defendant also was sued only in her official capacity, not as an individual.  Id.

official capacity claims should not be dismissed when plaintiff seeks punitive damages.  See Thouvenell v. City of Pittsburg, Kan., No. 2:18-CV-2113-JAR-KGG, 2018 WL 3068199, at *3 (D. Kan. June 21, 2018); Quintero v. City of Wichita, No. 15-1326-EFM-GEB, 2016 WL 5871883, at *1 (D. Kan. Oct. 7, 2016) (plaintiff had avenue for punitive damages through individual capacity claim); Smith v. Stuteville, No. 14-2197-JWL, 2014 WL 3557641, at *4 n.1 (D. Kan. July 18, 2014) (individuals sued in official capacities immune from punitive damages).  The Tenth Circuit acknowledges that Youren is "an anomalous outlier" and recognizes that courts within the Tenth Circuit ignore Youren when dismissing punitive damages claims in official capacity under Section 1983 suits.  See, e.g., Cross Continent Dev., LLC v. Town of Akron, Colo., 548 Fed. Appx. 524, 531 (10th Cir. 2013); Thouvenell, 2018 WL 3068199, at *3.  Even if Youren continues to be good law, plaintiff's case is distinguishable because unlike in Youren, plaintiff alleges individual capacity claims against all of the individually named defendants.

Because plaintiff brings her First Amendment retaliation claims against both GCCC and the individual defendants in their official capacities, plaintiff's official capacity claims against Swedner, Douglass, Wasinger, Crist, Martinez and Worf are duplicative.  The Court therefore dismisses the official capacity claims against these defendants.

## III.    Conspiracy To Interfere With Civil Rights Under 42 U.S.C. § 1985(2)

Plaintiff alleges that in violation of 42 U.S.C. § 1985(2), Trustees Wasinger and Douglass conspired to speak at two Board meetings on June 9 and June 25, 2020.  Plaintiff alleges that at these meetings, Wasinger and Douglass "publicly blamed civil rights advocates within the last two years as the reason for a reported $500,000 plus jump in insurance premium/deductible costs for the College's errors and omissions liability coverages," and injured and intimidated plaintiff by sharing these comments with a wide audience.  First Amended Complaint (Doc. #7), ¶¶ 132, 204–

207.  Defendants argue that based on the publicly available videos of Board meetings, Wasinger and Douglass did not appear to conspire and their comments cannot be considered force, intimidation or threat.  Memorandum In Support Of Motion To Dismiss By Defendants (Doc. #26) at 26–29.  In the alternative, defendants argue that Wasinger and Douglass are entitled to qualified immunity.  Id. at 30.  The Court considers each argument in turn.

A.      Section 1985(2)

The first clause of Section 1985(2) contains a deterrence provision, which "concerns intimidating parties, witnesses, or jurors in court so that they will not attend court or testify."  King v. Knoll, 399 F. Supp. 2d 1169, 1179 n.57 (D. Kan. 2005).  The "deterrence" provision of 42 U.S.C. § 1985(2) provides that "[i]f two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."  42 U.S.C. § 1985(2).  The elements of a deterrence claim under Section 1985(2) are (1) a conspiracy, (2) intent to deter testimony by force or intimidation and (3) injury to plaintiff.  Brever v. Rockwell Int'l Corp., 40 F.3d 1119, 1126 (10th Cir. 1994).

Defendants challenge plaintiff's allegations regarding the first two elements: (1) conspiracy and (2) intent to deter testimony by force or intimidation.  A conspiracy "requires the combination of two or more persons acting in concert."  Abercrombie v. City of Catoosa, 896 F.2d 1228, 1230 (10th Cir. 1990).  A plaintiff must allege, "either by direct or circumstantial evidence, a meeting of the minds or agreement among the defendants."  Id. at 1231.  The conspiracy "must be one that has the requisite statutory purpose," namely to deter a party or witness from attending

or testifying freely, fully and truthfully.  Brown v. Chaffee, 612 F.2d 497, 502 (10th Cir. 1979).

While more than mere conclusory allegations are required to state a valid claim, "the nature of

conspiracies often makes it impossible to provide details at the pleading stage and . . . the pleader

should be allowed to resort to the discovery process and not be subject to dismissal of his

complaint."  Brever, 40 F.3d at 1126.

To satisfy the conspiracy element, plaintiff identifies Wasinger and Douglass and claims

that they engaged "in exchanges that appear[ed] preplanned or with prepared notes" that

disparaged lawsuits like plaintiff's.  First Amended Complaint (Doc. #7), ¶ 205.  To satisfy the

deterrence element, plaintiff alleges that Wasinger and Douglass linked GCCC's increasing

insurance costs and significant reductions in GCCC faculty, staff and student offerings to lawsuits

like plaintiff's.  Plaintiff claims that their actions deterred plaintiff by intimidation and threat from

attending or testifying freely, fully and truthfully in federal court because their comments (1)

implied that people involved in lawsuits like plaintiff were "bad people" and "essentially pariahs

in the Garden City community"; (2) created "an 'us' against 'them' civil rights based divisiveness"

in the community that intimidated plaintiff; and (3) threatened and harmed plaintiff's athletic and

professional career, economic standing and reputation in the community.  Id., ¶¶ 137–38, 158,

206–07.

Defendants argue that the publicly available videos of Board meetings prove that Wasinger

and Douglass (1) did not have a meeting of the minds because Douglass stated in the video that

she was sharing her "personal feelings" and (2) did not make comments that could be considered

"force, intimidation, or threat" under Section 1985(2) and instead only made vague comments

about the economic impact of lawsuits on GCCC.  Memorandum In Support Of Motion To Dismiss

By Defendants (Doc. #26) at 26–29.  As stated, the Court cannot consider extrinsic evidence on a

motion to dismiss.  See Fed. R. Civ. P. 12(d); see, e.g., GFF Corp., 130 F.3d at 1384.  The Court also assumes the truth of plaintiff's allegations regarding the Board meetings videos.  Assuming as true plaintiff's well-pleaded factual allegations, plaintiff sufficiently pleads facts which create an inference that Wasinger and Douglass (1) had a meeting of the minds as demonstrated by their prepared notes and (2) intended to deter plaintiff from testifying about the Title IX allegations by bringing up plaintiff's lawsuit to stigmatize and discredit her.  First Amended Complaint (Doc. #7), ¶¶ 137–38, 158, 205–07.  The Court overrules defendants' motion to dismiss plaintiff's Section 1985(2) conspiracy claims.

### B.    Qualified Immunity

In the alternative, defendants argue that Wasinger and Douglass are entitled to qualified immunity on plaintiff's Section 1985(2) conspiracy claim because defendants "are unaware of any caselaw indicating that comments about the economic impact of a lawsuit will invoke liability under § 1985(2)."  Memorandum In Support Of Motion To Dismiss By Defendants (Doc. #26) at 30.  To overcome an official's qualified immunity, plaintiff must demonstrate that (1) the official violated a statutory or constitutional right and (2) the law clearly establishes that right.  See N.E.L., 740 F. App'x at 928.  A right is clearly established when every reasonable official would understand that what he or she is doing violates that right.  Id. at 928–29.

For the first factor, defendants argue that based on the publicly available Board meetings videos, Wasinger and Douglass' comments about insurance premiums and the economic costs of litigation "are a far cry from abusive and threatening comments" and "were neither abusive nor threatening as a matter of law."  Defendants' Reply Memorandum (Doc. #42) at 15.  As discussed above, the Court disregards such extrinsic evidence and accepts plaintiff's allegations that in violation of 42 U.S.C. § 1985(2), Wasinger and Douglass conspired to speak at two Board

meetings in June of 2020 to intimidate plaintiff and deter her from testifying about the Title IX allegations.  First Amended Complaint (Doc. #7), ¶¶ 137–38, 158, 205–07.

For the second factor, defendants do not dispute plaintiff's argument that the law clearly establishes the right to testify truthfully at trial—they instead again argue that the publicly available Board meetings videos prove that "no reasonable [Board] member would have thought that the specific comments made by Wasinger and Douglass [about the economic impact of lawsuits] were unlawful," i.e., threatening and intimidating under Section 1985(2).  Defendants' Reply Memorandum (Doc. #42) at 15.

The First Amendment clearly establishes the right to testify truthfully at trial, especially where plaintiff has brought forth matters of public concern like a Title IX allegation.  See, e.g., Patrick v. Miller, 953 F.2d 1240, 1247–48 (10th Cir. 1992); Melton v. City of Okla. City, 879 F.2d 706, 714 (10th Cir.1989).  As discussed, the Court will not consider the Board meetings videos in this motion to dismiss, and plaintiff pleads sufficient facts to give rise to the inference that Wasinger and Douglass conspired to deter her from testifying by threatening and intimidating her at the public meetings, which harmed her athletic and professional career, economic standing and reputation in the community.  First Amended Complaint (Doc. #7), ¶¶ 137–38, 158, 205–07.  Wasinger and Douglass are not entitled to qualified immunity, and defendants' motion to dismiss the Section 1985(2) conspiracy claim is overruled.

## IV.   Kansas Consumer Protection Act Claim

Plaintiff alleges that GCCC violated the Kansas Consumer Protection Act ("KCPA"), K.S.A. § 50-623 et seq., by promising her a "full ride" scholarship through deceptive and unconscionable practices and misrepresentations and then billing her for more than $13,000 by 2019.  First Amended Complaint (Doc. #7), ¶¶ 216, 227.  Defendants argue that this claim should

be dismissed as moot.  They contend that no live controversy exists because GCCC has not asked plaintiff to pay any invoices and "zeroed out" her bill while she was attending school. <u>Memorandum In Support Of Motion To Dismiss By Defendants</u> (Doc. #26) at 30–32.  Plaintiff, however, alleges that GCCC billed her in 2019 for more than $13,000 and that this sum is outstanding.  <u>First Amended Complaint</u> (Doc. #7), ¶¶ 227, 233.  The Court accepts plaintiff's well-pleaded allegations as true.  Accordingly, the Court overrules defendants' motion to dismiss as to plaintiff's KCPA claim.

    **IT IS THEREFORE ORDERED** that defendants' <u>Motion To Dismiss Plaintiff Tiumalu's Claims</u> (Doc. #25) filed October 9, 2020 should be and hereby is **SUSTAINED in part**.  The Court dismisses as redundant plaintiff's First Amendment retaliation claim against President Herbert Swedner and Trustees Merilyn Douglass, Blake Wasinger, Jeff Crist, Steve Martinez and Teri Wolf in their official capacities.  Defendants' motion is otherwise **OVERRULED**.

    Dated this May 6th, 2021 at Kansas City, Kansas.

<u>s/ Kathryn H. Vratil</u>
KATHRYN H. VRATIL
United States District Judge
